## STATE v. GEORGE D. GORMAN.[1]

December 29, 1944.

No. 33,857.

[1]Reported in 17 N. W. (2d) 42.

*William G. Compton,* for appellant.

*J. A. A. Burnquist,* Attorney General, *Ralph A. Stone,* Assistant Attorney General, *Michael J. Dillon,* County Attorney, and *Per M.*

164

*Larson* and *Theodore B. Knudson,* Assistant County Attorneys, for the State.

STREISSGUTH, JUSTICE.

Defendant was indicted for the murder of his cousin, Mary Haffie, an aged widow. Having been found guilty of murder in the first degree, he appeals from an order denying his motion for a new trial.

On August 4, 1943, Mrs. Haffie was living at the home of defendant in Minneapolis. The only other occupants of the dwelling at the time were defendant and Dorothy Greely, a roomer, defendant's wife having gone to Seattle only a few days previously. At eight o'clock in the morning, Miss Greely saw Mrs. Haffie alive and well in the latter's room on the second floor. Miss Greely left shortly afterward. Between 8:00 and 8:30 o'clock, defendant called Mrs. Haffie's physician, Dr. J. P. Flynn, reporting that she had fallen downstairs and that he thought she was dead. Dr. Flynn did not arrive until about 10:00 a. m., when he found the lifeless body of Mrs. Haffie in the basement.

The stairway to the basement had an improvised hand railing on one side, which defendant had erected the day following his wife's departure. It was made of lumber and very insecurely held in position at the bottom of the stairs by an upright made of two two-by-two's nailed together. The manner of its construction was such as to make the railing a lure and trap instead of a safety device. About three and one-half feet ahead of the bottom step was a round, upright iron post. To the right of the stairway was an enclosed toilet, "out of order" when Mrs. Haffie moved into the house, but put into working condition shortly afterward.

Mrs. Haffie's body was found lying at the foot of the stairway, her head in a pool of blood. The upright was lying in the pool, detached from the railing, and the middle third thereof was covered with blood. There was also a spot of blood on the iron pillar 18 inches from the floor, but none on the stairway.

An examination of the body by Dr. H. J. Welles, deputy coroner, revealed two deep lacerations, one 2.4 inches long on the right parietal and the other 1.2 inches long on the left. There was a fracture of the skull at its base extending up into the right parietal. Mrs. Haffie's hair was matted with blood. Her false teeth had fallen out. A small black-and-blue spot (ecchymosis) on the neck, black-and-blue marks extending around both upper arms, and smaller marks extending around both upper arms and on both forearms were also observed. Two ribs were broken. The coronaries and heart, in fact all her organs, were in excellent condition. Her bladder was practically empty, indicating that there had been no occasion for her to go to the toilet. At a later examination by an undertaker, a bruise was observed on the left cheekbone, as well as a small abrasion on the left side of the neck, which had bled and had been covered with tissue paper by someone.

The coroner's verdict was "skull fracture, due to fall." This would have ended the matter, except that further investigation cast great suspicion upon defendant and established a definite motive for murder.

Mrs. Haffie had inherited more than $20,000 from the estate of her husband, who died in 1939. She had no children of her own, and her nearest relatives were a half-brother, a niece, and Luetta Grasse and defendant, both cousins. On April 27, 1940, she made a will, prepared by John B. Halloran, her attorney, making specific bequests for masses to the Catholic church, of which she was a member, to two Catholic charities, and to divers individuals. These totaled $2,300. The residue of her property was devised and bequeathed to defendant and his wife.

On July 11, 1941, while a patient at St. Barnabas Hospital, Mrs. Haffie called Halloran to discuss a new will. Defendant appeared at the hospital during Mrs. Haffie's conference with Halloran, and she became very excited. Defendant, in turn, shook his fist in a threatening manner either at her or at Halloran. On the following day her second will was executed. By it, she made bequests of $50 to $1,000 each to the Catholic church, to neighbors, friends, chari-

ties, and for masses, and left the residue of her property to her friend Anna Husby, a neighbor, and to Mrs. Husby's daughter Betty, to the total exclusion of the Gormans.

Defendant immediately became very active in Mrs. Haffie's affairs. On the very day that her second will was executed, he wrote the Northwestern National Bank and Trust Company, in which Mrs. Haffie had a large deposit, as well as her safety deposit box, stating that a petition for the appointment of a guardian for Mrs. Haffie's estate was being filed. "There are people and forces at work," he wrote, "who are resorting to some unusual tactics to gain access to her account. * * * It has required some fast steps on my part to block those who in any way should have anything to do with Mrs. Haffie." In his letter he referred to E. P. Willcuts as her attorney handling the guardianship petition and as representing him. At about the same time, defendant interviewed a number of friends and neighbors of Mrs. Haffie, seeking to obtain evidence that she was incompetent or insane, but he met with reverses.

In the latter part of May 1943, defendant moved from his downtown residence to 1422 Dupont avenue north, within a few blocks of where Mrs. Haffie lived. Mrs. Haffie visited him occasionally at his new home. On July 18, she paid an extended visit to friends at Ham Lake. During her absence, defendant presented to the bank a power of attorney, dated July 12, properly signed by Mrs. Haffie, but which the state proved to be a forgery. On July 20, he demanded access to Mrs. Haffie's safety deposit box and requested that her savings account be made a joint account, payable to Mrs. Haffie and himself.

The state also offered in evidence a purported third will of Mrs. Haffie, also dated July 12, 1943, and prepared by Willcuts, which made no bequests for masses or to any Catholic organization, the bulk of the estate being devised and bequeathed to Mr. and Mrs. Gorman. Expert testimony was offered to show that this instrument was a forgery. Defendant suggests now that this testimony was irrelevant, because "defendant would have had more motive

for killing Mary Haffie if the will were genuine." Logically, perhaps; but, nevertheless, if the will was a forgery, defendant might well have considered that she be put out of the way before discovering the true facts.

There was considerable other evidence showing defendant's activities in Mrs. Haffie's affairs and his resentment of others who interfered; also, of his boasts that he would soon inherit her property.

It is familiar doctrine that a conviction of crime cannot stand on evidence of motive and opportunity alone. And, where proof of a crime itself rests entirely upon circumstantial evidence, the "circumstances proved" must be of such a conclusive nature as to exclude, to a moral certainty, every rational hypothesis except that of guilt. State v. Johnson, 173 Minn. 543, 217 N. W. 683; State v. Larson, 207 Minn. 515, 292 N. W. 107; State v. Kaster, 211 Minn. 119, 300 N. W. 897. But—

"* * * By the term 'circumstances proved' is not meant every circumstance as to which there may be some testimony in the case, but only such circumstances as the jury finds proved by the evidence. There may well be in any case testimony on behalf of the defendant as to inconsistent facts and circumstances, not conclusively proved, and which the jury may have a right to and do reject as not proved." State v. Johnson, 173 Minn. 543, 545, 217 N. W. 683, 684, *supra.*

Proof of defendant's motive and activities aside, we have found no substantial dispute as to the facts and circumstances surrounding Mrs. Haffie's death. The witnesses are in substantial accord in their narration of the events of August 4, 1943, preceding the discovery of her body; in their description of the dwelling house, the basement, the stairway and the railing, both before and after such discovery; in their details as to the location and position of her body upon discovery and the general scene in the basement at that time; and, finally, in their enumeration and description of her injuries. The dispute in the testimony, upon the determination of which the fate of defendant rested, was not as to these surrounding

facts and circumstances, but, in the expert opinions as to whether the injuries which Mrs. Haffie sustained were the result of accidental fall or the result of a blow administered by some unidentified person with some sharp-edged weapon.

Nevertheless, defendant, relying upon the familiar principles above stated, urges the following hypothesis as sustained by the evidence and not excluded to a moral certainty by the state's proof:

"On the morning of August 4th, 1943, Mary Haffie started down the basement steps, either to go to the toilet or for some other purpose. On her way down she stumbled and fell, either from a defective railing or otherwise. She fell forward and hit the back of her head on the pillar, staggered back and fell to the basement floor and struck the back of her head. In this manner she received the two wounds causing her death and the other wounds described."

Whether the hypothesis proposed by defendant is a rational one depends entirely upon the respective weight to be given to the expert opinions of the medical witnesses on the part of the state and the defense. If the opinion of the state's expert witnesses be accepted, death could not have been caused by a fall, but only by a a blow with an instrument having a sharp edge, such as the upright for the improvised stairway. The two cuts on Mrs. Haffie's right and left parietal were of such a nature, according to these witnesses, that they could not have been caused by her falling upon a flat surface such as the stairway itself or the basement floor, or against the rounded surface of the iron pillar. According to these witnesses, the black-and-blue marks on Mrs. Haffie's neck, upper arms, and forearms indicated a struggle with some human being.

The testimony of the physicians as to the manner in which the mortal wound was probably inflicted and as to the kind of weapon used was clearly competent. Underhill, Criminal Evidence (4 ed.) § 546. The credibility of the expert witnesses and the weight of their testimony was for the jury, to be determined by the same rules used in determining the weight of other testimony. *Id.* §§ 234, 485. The jury's finding, implicit in their verdict, that Mrs. Haffie's death

was due to a blow and not to a fall is amply sustained by the record; and, if such blow did cause death, the circumstances proved were not only consistent with defendant's guilt but inconsistent with any other rational hypothesis. Hence the verdict cannot be disturbed on the ground of insufficiency of the evidence.

■ Mr. Willcuts represented defendant at the trial and conducted the entire defense without assistance of other counsel until the state rested. It was then announced that M. S. Robb would be associated with him "for the purpose of conducting the examination of that feature of the defendant's case which will be covered by the testimony of Mr. Willcuts himself." Other than conducting the examination of Willcuts as a witness, Mr. Robb did not, however, participate in the trial. Upon the motion for a new trial and upon this appeal, defendant was represented by William G. Compton.

Defendant's present counsel urges, as ground for a new trial, the admission of numerous items of evidence which were received without objection, "but which," he asserts, "the court, on its own motion and for the protection of the constitutional rights of defendant, should have corrected or prevented." Admitting that there was no objection at the trial to the admission of testimony which he now considers was damaging to his client and that no motion to strike the testimony was made after it was given, counsel poses the question: "Can a defendant in a criminal case be penalized for the ignorance or neglect of his attorney in such an important matter as this?"

Willcuts was 37 years of age at the time of the trial and had had at least average experience in the practice of law in this state. He is a graduate of the College of Science, Literature, and Arts of the University of Minnesota and was admitted to practice in Minnesota in 1929 following his graduation from the Harvard Law School. An examination of the transcript satisfies us that he was a lawyer of at least ordinary ability, though not in the least formal or technical in his conduct of the trial. His ability in no event should be gauged by the number of objections made by him to the testimony offered by the state. It is not impossible even for a county

attorney to hew quite close to the line in offering testimony for the prosecution, and sometimes it is not poor strategy for a defense attorney, where the state does not offend seriously, to permit evidence to go in without objection, though technically inadmissible.

Commenting upon Willcuts' handling of the defense, the trial court in denying a new trial said:

"The defendant was represented at the trial by Edgar P. Willcuts, who conducted the trial in an open manner and without making many objections to the evidence. He apparently believed it was in the best interests of his client to do so. In spite of the absence of objections to the rulings of the court, Mr. Willcuts ably and conscientiously represented his client, and the defendant was accorded a fair and impartial trial."

Willcuts had been Gorman's attorney for several years prior to the trial. He was named by defendant as his attorney in the letter of July 12, 1941, to the Northwestern National Bank and Trust Company, advising the bank that guardianship proceedings were being instituted for Mrs. Haffie. He prepared her purported will dated July 12, 1943, and was active in defendant's behalf in preparing for his defense. Having been voluntarily chosen by defendant as his attorney, defendant is hardly in a position to argue—now that the trial is over and the result unsatisfactory—that justice should intercede in his behalf and give him another opportunity to establish his innocence. Defendant, having deliberately selected Willcuts as his attorney, because of their former association and Willcuts' familiarity with Mrs. Haffie's affairs, should "with the possible advantages of such choice, suffer the accompanying inconveniences or detriment." State v. Dangelo, 182 Iowa 1253, 1256, 166 N. W. 587, 588.

Absent infidelity on the part of his attorney, defendant should not be permitted to urge ignorance or incompetence of or mismanagement by the attorney as ground for a new trial, even in a criminal case. Certainly not where there is no strong showing of incompetence and prejudice. Annotation, Ann. Cas. 1913D, 499; 46

C. J., New Trial, § 161; Darby v. State, 79 Ga. 63, 3 S. E. 663; State v. Benge, 61 Iowa 658, 17 N. W. 100; Sayre v. Commonwealth, 194 Ky. 338, 238 S. W. 737, 24 A. L. R. 1017; O'Brien v. Commonwealth, 115 Ky. 608, 74 S. W. 666; State v. Dreher, 137 Mo. 11, 38 S. W. 567; Territory v. Clark, 13 N. M. 59, 79 P. 708.

In answer to a contention similar to the one here urged, it was said in Graham v. Squier (D. C.) 45 F. Supp. 253, 254:

"* * * A man should not, through his attorney, allow certain evidence to be introduced without objection with the hope that it will help him, and then if the result of the jury's verdict is adverse say he did not have a fair trial. If that were true every defendant would just hope that improper evidence would be presented against him and make no objection to it with the idea that he might be acquitted and could walk out the door, and if he were convicted he would not lose anything anyway because in such later event he could have a new trial. I do not know why Mr. Graham's attorney made no objection. But since the petitioner had an attorney who was not forced upon him by anyone other than his own wife and since he ratified that employment it seems to me that he is bound by what his attorney did and by what his attorney failed to do."

One of the possible "inconveniences or detriment" of having Willcuts appear as defense counsel was that Willcuts himself might become an important witness and be subjected to vigorous cross-examination to explain his activities in Mrs. Haffie's affairs. That was a chance which defendant took, and, having taken it voluntarily, he cannot complain of the consequences.

 The assumption by Willcuts of the dual role of attorney and witness gave the state a legitimate opportunity vigorously to cross-examine him even to the extent of challenging the authenticity of the will prepared by him and the legality of any of his acts or conduct in connection with the case. Even if that opportunity was improperly taken advantage of by the state, this court should not interfere by granting a new trial unless it appears that prejudice

necessarily followed and could not be removed by a cautionary instruction from the trial court. On this aspect of the case, we need only refer to two instances which occurred at the trial.

Dr. H. J. Welles, deputy coroner, was an important witness for the state, having been at the scene of the alleged murder before Mrs. Haffie's body was removed. After his examination and cross-examination had been fully completed, the following occurred on redirect examination:

"Q. Dr. Welles, a few days since, did you have any talk with anyone in your office?

"A. Yes, sir.

"Q. With whom,—in respect to this case?

"A. A party by the name of Willcuts.

"Q. Is that the same party, this attorney?

"A. Yes, sir.

"Q. State whether or not any money was offered?

"A. Yes, sir.

"Q. How much money?

"A. $50.

"Q. State the conversation?

"A. I was offered $50 to testify in Mr. Gorman's behalf.

"Q. When was that done?

"A. Within the last week or ten days."

The witness did not testify that he had been requested to falsify or to shade his testimony in favor of defendant, yet the obvious purpose in his being questioned with respect to the incident was to create an impression in the minds of the jury that there was something improper or illegal in the offer to him by Willcuts of $50 to testify in defendant's behalf.

The statute requires that the names of witnesses who testify before a grand jury be endorsed upon any indictment returned by it. An obvious and, in fact, the main purpose of this requirement is to advise the defendant of the names of witnesses who may be called by the state upon the trial of the indictment, so as to afford him an

opportunity to contact them, if he so desires, and to ascertain, if possible, what their testimony will be. It follows that there can be nothing improper in the conduct of one accused of crime in interviewing such witnesses, prior to trial, so long as no effort be made improperly to influence their testimony.

Nor is there anything improper in an attorney's offering a physician and surgeon, whose expert testimony he desires, a sum in excess of the usual witness fees for his attendance upon the trial. Courts will take judicial notice of the fact that $50 is not an unusual fee to pay for expert medical testimony, and the naked offer of Willcuts to pay Dr. Welles that sum to testify in defendant's behalf was not improper so long as no attempt was made to have him testify falsely.

Had a proper request been made to strike the quoted testimony or for an instruction advising the jury that the incident testified to did not indicate any improper conduct on the part of defendant or his counsel, it would have been the court's duty to grant such request. But defendant and his counsel, instead of making such request, elected to explain and enlarge upon the incident in re-cross-examination of Dr. Welles by showing the entire discussion between him and Willcuts. Defendant, therefore, is in no position to complain that the incident might have had an unfavorable effect upon the jury.

Furthermore, we observe, average jurors, as well as judges, know the high price of medical testimony, and an attorney's offer to pay a physician $50 to testify in his client's behalf would not be likely to prejudice them. And, as said in State v. Hass, 147 Minn. 269, 271, 180 N. W. 94, 95: "The jury * * * is not swayed by every imprudent or wrongful remark of counsel. We must credit it with exercising good judgment." See, also, James v. C. St. P. M. & O. Ry. Co. 218 Minn. 333, 16 N. W. (2d) 188. On the record before us, we are of the opinion that the incident complained of was not prejudicial to the extent of materially affecting the decision of the jury.

■ Later in the trial, the state offered expert testimony that the purported last will and testament of Mrs. Haffie dated July 12, 1943, which had been prepared by Mr. Willcuts and executed in his office, was forged. Willcuts, as part of defendant's case, took the witness stand to disprove the charge, and M. S. Robb, another attorney, was called into the trial to conduct the examination of Willcuts as a witness.

Early in his direct examination of Mr. Willcuts, Robb asked him, "Has your honesty ever been questioned by the bar association or the ethics committee?" to which Willcuts answered, "Not that I know of." He was also asked, "Were you ever charged with dishonesty or anything in your relations with clients, or a member of the bar association or anybody else, dishonesty, I mean?" to which he replied, "No, I have not been." The state then had identified a contract for deed between third parties, which had no relevancy to the issues in the murder trial, and asked Willcuts whether or not he had not tampered with and altered the contract for deed. This he denied. The testimony relative to the contract for deed was objected to as incompetent, irrelevant, and immaterial and improper cross-examination. The objection was overruled, and Willcuts thereupon made his explanation of the incident and denied positively that he had altered the contract.

Mr. Robb considered the incident as serious and prejudicial and immediately moved for a mistrial on the ground that the admission of the evidence was so prejudicial that it could not be corrected by an admonition from the court. However, Mr. Willcuts asked the court to vacate the Robb motion for a mistrial, and, instead, he made a motion to strike all the testimony with reference to the contract for deed. The motion was granted, but not until the court had asked Willcuts whether he wished to withdraw Mr. Robb's motion for a mistrial and had received an affirmative reply. The court then instructed the jury to disregard all the testimony in respect to the contract for deed.

We do not approve of the conduct of the county attorney in injecting this irrelevant and prejudicial matter into the trial, and,

had defendant and his counsel not themselves deliberately decided that its prejudicial effect would be erased by the court's admonitory instruction, we would have been loath to permit the verdict to stand, notwithstanding the instruction. See, 39 Am. Jur., New Trial, § 114. But having, through his counsel, elected not to stand upon his motion for mistrial and definitely indicated his willingness to proceed after the improper questions and answers had been stricken and the jury admonished to disregard it, defendant is in no position to complain.

While finding no reversible error, we feel warranted in suggesting to counsel for the state, for their future guidance, careful consideration of the words of Mr. Justice Sutherland in Berger v. United States, 295 U. S. 78, 88, 55 S. Ct. 629, 633, 79 L. ed. 1314, 1321:

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor— indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

Affirmed.