## STATE v. JERRY LEE BAILEY.

132 N. W. (2d) 720.

January 8, 1965—No. 39,067.

*Si Weisman,* for appellant.

*Walter F. Mondale,* Attorney General, *George M. Scott,* County Attorney, and *Philip J. Bloedel,* Assistant County Attorney, for respondent.

NELSON, JUSTICE.

Defendant, Jerry Lee Bailey, appeals from a judgment entered upon a verdict of guilty of grand larceny in the first degree. Upon the jury's verdict and defendant's plea of guilty to a prior conviction of robbery in the first degree, the trial court sentenced defendant to the Stillwater State Prison for an indeterminate sentence.

Defendant was represented at the trial below by counsel of his own choice, who defendant now alleges conducted his defense in an inadequate and inept manner. Upon a finding of indigence, the present appellate counsel was appointed by this court on June 21, 1963, for the express purpose of assisting defendant in perfecting and presenting his appeal.

The information charged defendant and Richard Bruce Milhollan with grand larceny in the first degree, alleging that they stole $35 in the nighttime by taking it from the person of Arnold Olsen in the city of Minneapolis on August 23, 1962.

The complaining witness, Arnold Olsen, is a self-employed building contractor who resides in St. Paul Park. He testified that on the evening of August 22, 1962, he made a collection between 7 and 8 p. m. amounting to $37.94; that he put the money in his billfold and placed it in his left hip pocket. He stated that separate from the money in his billfold he carried about $75 in his trouser pocket from a check which he had cashed earlier that day. He said that he may have had more than $37 in his billfold but that he could not be sure of this. After making the collection, he proceeded to downtown Minneapolis, arriving at the Hurdle Bar at approximately 8 p. m. His testimony indicates that he patronized six different Minneapolis bars and consumed 13 or 14 drinks of vodka and 7-Up before he arrived at the Happy Hour Bar about midnight. He nevertheless testified that he was not drunk; that he had control of his senses and had no difficulty either in speaking or walking.

He testified that at the Happy Hour Bar he met defendant and Milhollan while seated near them; that he purchased a round or two of drinks; and that he left the bar with the two men to go to a "good spot to eat."

Milhollan's testimony, however, is that he met Olsen in Alice's Pancake House about 1 a. m., and that he, Olsen, and another man (Milhollan denied that defendant was one of them) left from Alice's Pancake House and not from the Happy Hour Bar. Where the three met is of little significance when the record as a whole is taken into account since, in any event, they entered a blue convertible automobile, believed by Olsen to be of a yellow color, and drove off.

Olsen testified that the negro with whom they entered the automobile in question was defendant; that defendant drove the automobile in a northerly direction, stopping the automobile shortly after crossing a bridge; that after they stopped they sat for several minutes with no one saying anything; that then defendant got out on his side of the car and walked around to the other side of the car and then Milhollan got out. Olsen testified that when he attempted to get out of the car defendant struck him on the chin with his fist; that upon being struck he said, "Don't hit me again; tell me what you want," whereupon de-

fendant said, "Well, give me your billfold." Olsen handed defendant his billfold; defendant later returned it to him and asked whether he had any more money. Olsen replied that he did not. At this point Olsen testified that he jumped out of the car, ran about a block to a gas station, and called the police. Olsen says he examined his billfold at the gas station and discovered all the money had been taken but that cards and other items were left. He testified to a loss of $35 from the billfold but that he still had $12 in cash left in a pocket.

Milhollan testified at the trial that subsequent to the theft he and his companion went to a restaurant and obtained change for the stolen bills, splitting the proceeds equally. Milhollan also testified that he was under the impression that $50 in bills had been taken from Olsen's billfold and that the amount taken was composed of five $10 bills.

On the next night, August 23, the Minneapolis Police Department apprehended defendant and Milhollan while they stood on a street corner. Later that evening Olsen identified the two men in a police lineup as the men who had slugged and robbed him.

On the following day, August 24, Milhollan signed a statement implicating defendant as his accomplice in the robbery. That statement was reaffirmed under oath on September 17 when Milhollan appeared with his attorney before Judge Leslie L. Anderson in Hennepin County District Court and changed his plea from not guilty to guilty. Judge Anderson asked Milhollan if he was present when Bailey hit Olsen in the jaw and took his billfold. To that question Milhollan responded in the affirmative. Six days later Milhollan sent a letter to the county attorney in which he repudiated his former statement and exculpated defendant of all liability in connection with the robbery. But, again on October 22, 1962, before the same judge at sentencing proceedings and under oath, he reversed himself and for the third time implicated defendant as his accomplice.

At the trial, defendant called one Lynn Tupper as a witness in his behalf. He testified that defendant and Milhollan came to a health studio which he operates in Minneapolis, about 12:05 a. m., August 23, 1962; that defendant asked Tupper if he could use his car as he wanted to take some girls home. Tupper agreed but wanted a ride

home. The three left the health studio at 12:35 a. m. in Tupper's 1960 blue Bonneville convertible automobile, arriving at Tupper's home at 12:50 a. m. Tupper then turned the car over to defendant and Milhollan, who drove away. Defendant, Milhollan accompanying him, returned the car to Tupper later the same morning, about 9:30 a. m.

Milhollan, who had pleaded guilty to the robbery as an accomplice and who had been sentenced and. incarcerated at the St. Cloud Reformatory, was called as a witness by the prosecution. He testified that he was acquainted with defendant; that he was with Olsen on August 23, 1962, between the hours of 1:30 and 2:30 a. m.; that he was one of the persons who took money from Olsen at the time stated in the information; and that although he was not sure how much money was taken, he split the money with his accomplice. At this point the prosecution asked Milhollan if he recognized the defendant in the courtroom as his accomplice. Milhollan said that Bailey was not his accomplice in the robbery but whoever his accomplice might have been, he was a person who looked very much like defendant. The prosecution then proceeded to impeach Milhollan by previous statements he had made in which he named defendant as his accomplice.

The statements used as impeachment were (1) the signed statement given by Milhollan to the police on August 24; (2) the disclosure to Judge Anderson on September 17 at the hearing at which he changed his plea from not guilty to guilty; (3) the statement on October 22, 1962, before Judge Anderson when he was sentenced. On each of the foregoing occasions he had implicated defendant in the attack on Olsen.

Defendant's counsel did not object to this course of impeachment pursued by the prosecutor, and counsel on appeal asserts that such failure is grounds for reversal since it illustrates defense counsel's inadequacy and ineptness.

In his deposition, defense counsel states his reasons for not objecting to the impeachment evidence as follows:

"Based on my own judgment and my feeling at the trial that the prosecution was bound by the testimony of his own witness, and based

68

on my feeling that this witness did not testify in support of their case, that sufficient damage had been done to the State's case, where my objection would have offered them the opportunity to claim surprise, giving them that opportunity; that they had undertaken to impeach their own witness, I felt, based on my own judgment at the time of the trial, that this was the best strategy."

It is clear that he purposely adopted the course which he followed when he was forced to decide how best to meet the impeachment evidence. He was quite well aware that the prosecutor was about to impeach his own witness and with that knowledge concluded that the better course would be not to object.

We think the record as a whole fairly shows that defendant's trial counsel provided adequate representation in the constitutional sense. He graduated from an accredited law school, is a member in good standing at the bar, and had been, at the time, in the practice of law for approximately 3½ years. He became acquainted with defendant when appointed by the Federal court to represent him on a white slavery charge. The government dismissed that case on the day it came up for trial. Apparently it was a few days thereafter that defendant was apprehended for the robbery here involved. Defendant retained the same counsel then of his own choice and paid him, through the assistance of his parents, $250 as a retainer to represent him at the trial below. There is every indication that, although counsel was somewhat limited in experience at trial, he nevertheless diligently prepared for trial by investigating facts and seeking out potential witnesses for the defense. The record discloses that he was diligent in raising evidentiary objections and conducting cross-examination. There are indications that he researched applicable law, delivered an opening statement and closing argument in a creditable manner, and submitted and discussed with the trial court several relevant jury instructions. It also appears that he presented appropriate motions and arguments, not only before but during and after the trial. On the whole, as we see it, whatever defendant may claim to the contrary, defendant's counsel clearly demonstrated attention to duty and loyalty to his client. Had his lack of experience combined with other circumstances to make the trial a

sham, then a different result would be reached. United States v. Myers (E. D. Pa.) 167 F. Supp. 510.

The evidence against defendant is such that even the most experienced counsel might well hesitate to promise defendant that he could do more than give his best in conducting his defense.

After the prosecution had completed the impeachment of Milhollan, defendant's counsel subjected Milhollan to a searching cross-examination. That cross-examination was extensive, covering Milhollan's actions during the day and evening preceding the crime and all events before and subsequent to the crime. Milhollan's testimony, however, under cross-examination turned out to be in substantial agreement with that which he gave on three occasions previous to the trial, with the exception of the testimony about the identity of his accomplice. He continued to insist at the trial that defendant was not the person with him at the time of the commission of the crime, but rather that the person with him was someone who looked like defendant and whose name he did not know, and whom he had not seen since he was dropped off by him after the robbery occurred.

The only issue of any consequence on this appeal is whether defendant was deprived of a fair trial because of inadequate representation. Defendant's claim that his attorney at the trial below was inept is founded upon two grounds only—that he had no previous trial experience in criminal cases and that he had failed to object when the prosecution sought to impeach Milhollan.

We quote from Annotation, 74 A. L. R. (2d) 1390, 1397, as follows:

"* * * [I]t may be said without undue hesitation that the cases are few indeed in which it has been held that the representation furnished an accused by counsel of his own choice was so inadequate that his conviction was void. That there are not more such cases is somewhat surprising when one considers the types of misconduct by a retained defense attorney which have been held insufficient to justify setting aside the conviction of the accused."

The general rule is well stated in United States v. Cariola (D. N. J.) 211 F. Supp. 423, 427, as follows:

"* * * Mere improvident strategy, bad tactics, mistake, carelessness, or inexperience do not necessarily amount to ineffective assistance of counsel unless taken as a whole the trial was a mockery of justice. Even misleading advice by counsel to his client is not ground for relief, unless it clearly rises to the level of unprofessional conduct."

Another case dealing with inadequacy of counsel is Mitchell v. United States, 104 App. D. C. 57, 62, 259 F. (2d) 787, 792. The majority there denied the allegation that trial counsel was insufficient. In so holding, they stated:

"Trial counsel must make many decisions of an almost infinite variety in the course of a criminal trial: whether to advise a plea to a lesser offense; whether to object; whether to offer a witness of possibly doubtful credibility or with a criminal record; whether to risk crystallizing the view of the judge at that point by a motion for a directed verdict before the defense testimony is in; whether to advise the defendant to take the stand and subject himself to cross examination; how to argue the case to the jury; whether to advise the defendant not to go to trial at all but rather to rely upon the mercy of the court. All these and more are practical questions and very real questions. Bad judgment, or even good but erroneous judgment, may result in adverse effects. These are simple facts of trial; they are not justiciable issues."

It is enunciated in United States v. Ragen (7 Cir.) 176 F. (2d) 579, 586:

"As to the requirement under the Fourteenth Amendment, the services of counsel meet the requirements of the due process clause when he is a member in good standing at the bar, gives his client his complete loyalty, serves him in good faith to the best of his ability, and his service is of such character as to preserve the essential integrity of the proceedings as a trial in a court of justice. He is not required to be infallible. We know that some good lawyer gets beat in every law suit. He made some mistakes. The printed opinions that line the walls in our offices bear mute testimony to that fact. His client is entitled to a fair trial, not a perfect one."

This court, in State v. Gorman, 219 Minn. 162, 170, 17 N. W. (2d) 42, 46, said:

"Absent infidelity on the part of his attorney, defendant should not be permitted to urge ignorance or incompetence of or mismanagement by the attorney as gound for a new trial, even in a criminal case. Certainly not where there is no strong showing of incompetence and prejudice."

And, in State v. Lindstrom, 180 Minn. 435, 438, 231 N. W. 12, 13, this court said:

"* * * Where the defense is conducted by counsel selected by defendant or by those to whom he intrusted that duty, it is only under very exceptional circumstances that a new trial will be granted on account of the manner in which the defense was conducted or on account of a subsequently asserted dereliction of duty on the part of such counsel, and where it appears that in consequence of such dereliction of duty the defendant may have been unjustly convicted."

The defendant has cited two cases in support of his position—State ex rel. Grattan v. Tahash, 262 Minn. 18, 113 N. W. (2d) 342, and State ex rel. Dehning v. Rigg, 251 Minn. 120, 86 N. W. (2d) 723. The distinguishing elements common to both cases are: (1) Defendant was represented by court-appointed counsel; (2) defendant entered a plea of guilty—there was no trial; (3) defendant had inadequate interviews with his counsel; and (4) the facts showed that defendant lacked the requisite guilty intent which highlighted defense counsel's inadequate preparation in that he permitted defendant to plead guilty. In both cases statements made to the court by the accused impelled this court to hold that the facts were such that the trial court should not have accepted a plea of guilty. The case before us on this appeal is concerned with trial tactics employed by defense counsel, not whether defendant had the requisite intent to commit the crime alleged.

Numerous cases have been cited by the defense on appeal to support the claim that trial counsel was not adequate. One of these cases is Lunce v. Overlade (7 Cir.) 244 F. (2d) 108, 74 A. L. R. (2d) 1384, wherein it appears that appointed counsel did not appear

at the time of trial. An attorney from another state happened to be in the courtroom and gratuitously volunteered his services so that the trial might proceed. The court found that the out-of-state counsel was so ignorant of Indiana law and procedure that it was virtually impossible for him to protect or even assert defendant's rights. Other cases cited by defendant holding trial counsel inadequate concern actions through the trial causing the issue of counsel's sanity to be raised;[1] a situation where the trial counsel was apparently not an attorney;[2] and one in which counsel refused to give a final argument because he felt that defendant was guilty of the crime charged.[3] It seems clear to us that in each of the foregoing cases cited, the trials were clearly sham and ineffective, which is not the situation in the case before us.

We find no basis in the record to support an allegation that trial counsel was inadequate within the meaning of Minn. Const. art. 1, §§ 6 and 7.

The state relies on Wheeler v. United States, 93 App. D. C. 159, 211 F. (2d) 19, certiorari denied, 347 U. S. 1019, 74 S. Ct. 876, 98 L. ed. 1140. In that case the last act of the witness was a retraction of the statement implicating the accused, while in the instant case the witness' last statement to the authorities under oath before sentencing as an accomplice reiterated the substance of the former statements implicating the defendant in the crime to which the witness had pleaded guilty. The prosecution might reasonably expect that the witness in the case at bar, when placed under oath, would return to the true statement rather than its spurious contradiction. See, United States v. Graham (2 Cir.) 102 F. (2d) 436, certiorari denied, 307 U. S. 643, 59 S. Ct. 1041, 83 L. ed. 1524; Ellis v. United States (8 Cir.) 138 F. (2d) 612; Weaver v. United States (9 Cir.) 216 F. (2d) 23; Stevens v. United States (9 Cir.) 256 F. (2d) 619; State v. Saporen, 205 Minn. 358, 285 N. W. 898; State v. Lemke, 207 Minn. 35, 290 N. W. 307; State v. Schwartz, 266 Minn. 104, 122 N. W. (2d) 769.

---

[1]People v. De Simone, 9 Ill. (2d) 522, 138 N. E. (2d) 556.

[2]People v. Cox, 12 Ill. (2d) 265, 146 N. E. (2d) 19, 68 A. L. R. (2d) 1134.

[3]Johns v. Smyth (E. D. Va.) 176 F. Supp. 949.

In the instant case where no objection was made to the impeachment no question can arise now as to the trial court's exercise of its discretion in ruling as he did. While defense counsel decided not to object to the state's impeachment of its own witness, the trial court nevertheless gave the jury an instruction stating the limited purpose of such evidence and these factors distinguish the present situation from State v. Saporen, *supra*. In the instant case the trial court charged the jury as follows:

"Evidence was introduced to the effect that a witness previous to this trial made both oral and written statements inconsistent with his testimony at this trial. I instruct you that this evidence concerning the previous inconsistent statements is not to be considered by you as proof of the truth of what was said in those previous statements, but may be considered by you along with the witness' denial or explanation of the previous statement insofar as it may affect the credibility of the witness' testimony in court. This is because that evidence of a previous inconsistent statement is what we judges and lawyers call hearsay and is not proper legal substantive evidence to prove what the defendant may have done. Evidence of previous inconsistent statements by a witness is admitted in evidence only insofar as it may prove that the witness has stated two different versions of what he knows and thus may tend to prove to you that his testimony at the trial should not be believed."

While defendant argues that the trial judge should have stopped the prosecution from attempting to impeach Milhollan on his own motion, ample evidence nevertheless exists in the record to sustain a finding, if one were necessary, that Milhollan changed his testimony, testimony given under oath, because of friendship for, or fear of, the defendant. It should be expected under the circumstances that the trial judge would allow liberal cross-examination of such a witness to bring out the truth of the matter. The witness Milhollan had made one statement out of court and two prior statements in court under oath. No rigid adherence to a rule of evidence, under circumstances surrounding Milhollan's testimony and attitude when called as a witness by the state, should

protect a corrupt witness against attack. State v. Jensen, 151 Minn. 174, 186 N. W. 581.

The court's indication of the proper approach to a consideration of the impeaching evidence by the jury prevented whatever error may have occurred from becoming reversible error on appeal. Wheeler v. United States, *supra*. Furthermore, we think that defense counsel's decision not to object to the prosecutor's attempted impeachment of the witness prevents any effective attack on the impeachment episode on this appeal.

A careful consideration of the record herein has convinced us that the evidence of defendant's guilt is both substantial and ample without reference to the impeaching testimony herein.

Defendant's claim that trial counsel was incompetent has failed to meet the legal test on that issue. Whatever else may be said in regard to his inadequacy or ineptness, the record discloses that he faithfully and consistently carried on the defense on behalf of defendant throughout the entire trial.

We are convinced that the lower court's judgment of conviction must be affirmed.

Affirmed.