## STATE v. LOYAL EDWARD LUNDSTROM.

171 N. W. (2d) 718.

October 31, 1969—No. 41592.

*C. Paul Jones,* State Public Defender, and *Roberta K. Levy,* Assistant State Public Defender, for appellant.

*Douglas M. Head,* Attorney General, *Richard H. Kyle,* Solicitor General, *J. Dennis O'Brien,* Special Assistant Attorney General, and *Carl E. Erickson,* County Attorney, for respondent.

Heard before Nelson, Murphy, Otis, Sheran, and Frank T. Gallagher, JJ.

FRANK T. GALLAGHER, JUSTICE.

Appeal by defendant from a judgment of conviction in the district court entered upon a jury verdict of guilty.

Defendant was convicted of first-degree manslaughter in the death of his wife in the early morning hours of October 7, 1967. It is clear from the record that prior to the incident involved defendant was a man of very good reputation, extremely active in his church and community affairs, who had no past history of violent action, and to all who knew him appeared to be a good father and husband. The testimony to this effect was offered by the ministers with whom he had been associated, their wives, his 16-year-old daughter, his 20-year-old son, and the family of his deceased wife.

Defendant and his wife had been married for about 20 years. They had five children, four living at home and one in the Navy. During most of their marriage they lived in or near Montevideo, Minnesota, where defendant was employed at the same job for 15 years. In addition to his job, defendant at different times during this period held various offices in his church and was president of the Montevideo Interdenominational Holiness Camp, and elected member of the Watson, Minnesota, School Board, and an active volunteer fireman.

In 1965 the family purchased a resort in Merrifield, Minnesota, near Brainerd, and moved there to live. In addition to running the resort defendant held several jobs with firms in the area. He had been with one company about a year at the time of his wife's death. He continued to be active in his church, holding the position of superintendent of the Sunday school. His wife taught Sunday school classes. During this time their closest friends were the Reverend Holland Reidel, the pastor of their church, and his wife. The families visited back and forth on an average of twice a week and at the time of the events in question here were living within a quarter of a mile of each other.

The uncontradicted testimony at trial indicates that during the last few months preceding her death there was a definite change in the physical and mental condition of defendant's wife. She lost weight and suffered from severe headaches for which she took large amounts of aspirin. She seemed to lose interest in her normal housewifely duties and in her family and suffered frequent periods of depression. On several occasions she failed to answer the telephone when it rang even though she was within a few feet of it. Mrs. Reidel testified that on one occasion Mrs. Lundstrom looked at her youngest child, became quite pale and solemn, and stated: "You don't belong to me." When the child denied this she repeated the statement. The testimony further indicated that defendant made a considerable effort to find out what was troubling his wife and to help her. He asked the help of his brother-in-law and father-in-law and asked his oldest daughter to talk to her mother and try to get her to snap out of it. He repeatedly urged her to see a doctor, but she refused. Defendant believed his wife was tired from the hard work connected with running the resort during the summer months, and in an effort to help he took the family out to dinner often and on frequent trips to see relatives.

The evidence in the record as to what occurred in the Lundstrom home on the night of Helen Lundstrom's death is found mainly in defendant's testimony, substantiated by the testimony of his daughter and the Reidels as to some particulars, and by the medical and physical evidence as to others.

The Lundstrom family had dinner about 6:30. Except for the son in service the entire family was present. One of the Reidel children was also there as a guest. Following the meal the defendant read to the family from the Bible and his wife led them in prayer, as was their custom. The Reidels arrived about 8 p. m. with some music defendant's oldest daughter was to play for a funeral the next day, and stayed to visit for about a half hour. Before leaving they agreed to let their daughter stay overnight, after inquiring whether Mrs. Lundstrom felt "up to" having

another child in the house. They said she was in a good mood when they left.

From the time the Reidels left until the family retired about 1 a. m., defendant sang along as his daughter practiced playing the hymns and then drank coffee and prepared Sunday school lessons at the kitchen table with his wife. About 1 a. m. the Lundstroms began to prepare for bed although the children were still awake upstairs and making noise. Since it was a Friday night they were allowed to stay up. The oldest daughter told the younger children stories and they fell asleep; she remained awake and heard some of the subsequent events.

Defendant testified that when they went to bed he attempted intercourse with his wife, as she appeared in a receptive mood, but after he had removed her pajama pants her mood changed abruptly and she bit him quite hard on the hand. He stopped and informed her that they would not continue if she did not wish to. She replaced her pajamas and left for the kitchen, stating that she needed air. Defendant followed her and told her not to go outside as she was barefoot and in light pajamas. She did not listen and went out to a shower-and-washroom building used in connection with the cabins and located about 60 yards from the house, entering the side marked "Men." Defendant followed, trying to talk to her. Once they were both inside Helen became more and more hysterical and began hitting defendant with her fists. The daughter, who had heard her parents in the kitchen and heard the door slam, heard her mother scream and shout "Why do you always have to act like this?" or similar words. Defendant testified that in an attempt to restrain his wife he put one hand on her neck and the other at her waist and pushed her against the wall. She jerked back and fell to the floor. Defendant thought she had fainted and attempted to revive her by slapping her face. When this failed he felt for a pulse and found none. He left the body where it was, reentered the house to get a shirt and shoes, and then drove directly to the Brainerd Police Department without calling anyone for help.

The daughter was able to testify that she heard "slapping" noises in her parents' bedroom, similar to what she had heard coming from there on other occasions, and that she heard someone reentering the house just before she fell asleep. Her estimates as to the time were quite close to those given by defendant. There were no other witnesses who testified as to the events between 8:30 p. m. and just after 2 a. m., when defendant reached the police station.

When defendant arrived at the police station he told the officer in charge, Officer Harold Knutson, that he and his wife had been arguing, there was a struggle, and he "gave her a push and she fell down and she didn't get up," adding that he thought she was "gone." Defendant also told Knutson that it was a friendly argument and that he loved his wife and would not hurt her. Defendant identified himself with a business card for the resort, on the back of which was written the name and telephone number of Reverend Reidel, whom defendant asked Knutson to call. After making his statement defendant sat sobbing until Reidel arrived, at which time the two men were given a private office in which to talk.

Knutson testified that defendant had told him that just before he pushed his wife she had said, "I hate you, I hate you." Knutson did not mention this until the end of his testimony, after prodding by counsel for the state, although he said it occurred at the same time as defendant's other statements. He had not included it in a comprehensive report he prepared in lieu of appearing at a pretrial hearing. (Knutson's wife was undergoing surgery on the day of the hearing.) Defendant denied that his wife had made this statement to him or that he had told Knutson she made it.

A deputy sheriff was dispatched to the resort and found the body in the washroom. It was fully clothed in pajamas which had no buttons missing and were not ripped or torn in any way. Subsequently the chief deputy, an ambulance driver, and the county coroner arrived at the scene. All testified to substantially the

same facts. They found no signs of a struggle in the washroom and no blood, but they did observe marks on Mrs. Lundstrom's neck. They looked for something on which she might have hit her head—such as something which projected from the walls— but found nothing. They also looked for signs that the room had been cleaned up in any way, but found none. The coroner made a more detailed examination of the body and found dark blue discoloration at the fingertips, discloration of the upper part of the body, and petechial hemorrhages in the whites of the eyes. These are all indicia of death by asphyxiation. In addition he found a small amount of urine under the body which, he testified, was excreted at the moment of death.

After examining and taking pictures of the body, the men entered the house through the kitchen door. They found the house neat and orderly, with the exception of the bed in defendant's bedroom. There the blankets and sheets were in disarray, but apparently no more so than would be expected if two people had used the bed. On the bottom sheet they found several small spots of blood on the upper right-hand side; it was later determined that this was the side on which defendant slept. The officers checked the remainder of the house and found all the children well and asleep.

When he went to the police station defendant was given a "Miranda warning" by Officer Knutson. While defendant was talking to Reverend Reidel, the sheriff arrived and defendant was then transferred to the county jail. The sheriff questioned defendant after giving him a second "Miranda warning" and typed out a statement as they talked. Defendant signed the statement, and it was admitted at trial. In it he indicated that he and his wife had been having a disagreement over his work in connection with the building of a parsonage for their church and that she had not been talking to him lately; that they had had a little struggle when she refused him intercourse; and that when he tried to restrain her in the washroom by pushing her against the

wall she twisted and fell to the floor. In all other respects the statement is the same as what defendant had told Knutson.

When the coroner returned from the resort he, too, talked to defendant. Defendant indicated to him that he and his wife had been having some marital difficulties, and told the same story he had told the others. The coroner told defendant he should probably contact a lawyer. When defendant was questioned again by the sheriff, he indicated that he did not wish to answer any more questions and wanted a lawyer.

A complete autopsy was performed on the body of defendant's wife. Dr. William Knoll, the state's pathologist, testified at trial as to the results. The autopsy revealed bruises on the neck and a fresh bruise on each thigh, cyanotic nail beds (blue-black in color), congested blood vessels in several areas, including the brain and diaphragm, and an enlargement of the right ventricle of the heart caused by a large quantity of dark, blue-red, blood. There were no fractures or destruction of any of the bone or cartilage in the neck area, specifically the hyoid bone and laryngeal or circoid cartilage, although there was some evidence of hemorrhage in the area of the larynx. Dr. Knoll testified that in his opinion death was due to asphyxiation, but he had no way of knowing how that occurred. He said that on the basis of what he had read it would take "a few minutes" for death by asphyxiation to occur and leave the indications he found on various parts of the body. He acknowledged on cross-examination that pressure applied properly to the carotid sinus or plexus (nerves in the neck area where the bruises were found) may stop the heart almost instantaneously, but said that to the best of his knowledge he had never seen a case of that kind. He further stated that he had found no fractures of the hyoid bone or laryngeal cartilage in about 50 percent of the asphyxiation cases he had encountered. However, it was brought out on cross-examination that this estimate included cases where asphyxiation was due to suffocation, i. e., putting something over the mouth and nose of the deceased to cut off the air.

The coroner testified that in his opinion the asphyxiation which caused death was due to manual strangulation. He estimated the time necessary for this as 3 to 7 minutes, according to what he had read. He placed the time of death as about 1 a. m., but admitted that a time closer to 2 was well within the probable limits of his estimate. (He had found a watch on defendant's wife which was stopped at 12:48, but all the witnesses who knew her testified that the watch was very erratic and failed to run more often than not.)

Defendant called Dr. John Coe, who is the Hennepin County medical examiner and is certified in anatomic and forensic pathology. Dr. Coe did not perform an autopsy on the body and based his testimony on the autopsy report of Dr. Knoll. Dr. Coe had been the state's pathologist in State v. Mitchell, 282 Minn. 113, 163 N. W. (2d) 310, and State v. Axilrod, 248 Minn. 204, 79 N. W. (2d) 677, certiorari denied sub nom. Axilrod v. Minnesota, 353 U. S. 938, 77 S. Ct. 815, 1 L. ed. (2d) 760, both of which were strangulation cases. He testified that in every case of manual strangulation he had seen there was a fracture of either the hyoid bone or the cartilage or both. He was asked if he had an opinion as to the cause of the decedent's death after having read the autopsy report, having examined the pictures of her injuries, and having heard part of the state's pathologist's testimony. He replied that he could form no opinion and gave the following reasons:

"It is based on the fact that I have seen individuals with manual manipulations of the neck who did not die as a consequence of this having much more severe injuries than have been described in this case, and the fact that those cases of manual strangulation with which I am personally familiar had conversely shown much more injury, including fractures of bones in the voice box or hyoid or the trachea."

He further testified that he found nothing in the autopsy report inconsistent with defendant's version of how his wife died. Dr.

Coe also stated that the indicia of asphyxiation which were found in the autopsy could have occurred in a period as short as 30 seconds. He based this on cases of persons who choked on food and a few unusual suicides where it was possible to get an accurate determination of the time between the onset of asphyxia and death. On cross-examination he accepted as authoritative a textbook which contained the statement that in 13 out of 24 cases of manual strangulation studied there were fractures of various types (which implies, apparently, that in the other 11 cases there were no fractures). However, he went on to say that the percentage indicated by this statement was not accurate, based on his personal conversations with one of the authors of the book and a study of 100 cases by the same authors, published more recently, which shows a considerably higher percentage of the cases involved fractures. Dr. Coe did not testify that manual strangulation without fracture was impossible and, in fact, admitted that it was possible. He further agreed that the anatomical findings in the autopsy report were consistent with a manual-strangulation theory. Also, on cross-examination, the state brought out that the anatomical findings here were similar to those in the Axilrod case, in which Dr. Coe had testified there was manual strangulation. The difference, as brought out on re-direct, was that in the Axilrod case there was also a fracture of the hyoid bone.

Defendant had been charged with first-degree manslaughter under a grand jury indictment which read in part:

"The said Loyal Edward Lundstrom on the 7th day of October, A. D. 1967, at the Township of Lake Edward * * * did unlawfully, wilfully, wrongfully, *intentionally,* and feloniously, in the heat of passion and in a cruel and unusual manner, *but without a design to effect her death,* and provoked by words and acts of Helen Lundstrom as would provoke a person of ordinary self-control under like circumstances kill a human being, to-wit: one Helen Lundstrom by then and there strangulating her by choking her about the neck and throat and/or causing her suffocation

by other means which obstructed her breathing * * *." (Italics supplied.)

This indictment was read to the jury at least twice: Once at the outset of the trial in the opening statement of the prosecution and again by the court in the instructions to the jury. On both occasions it was followed closely by a discussion of the term "intentionally." There is an implication in the statements of defense counsel at the sentencing hearing that the indictment was also read a third time, probably at the impaneling of the jury, although this is not in the record.

On the basis of the evidence as outlined above, the jury found defendant guilty as charged. The deliberation lasted some 10 1/2 hours, during which time the jury returned once for further instructions, asking for an explanation of the terms "intent," "in the heat of passion," "provocations of acts and deeds of another," and "reasonable doubt." With the agreement of counsel the court gave the same instructions it had given originally. Following the entry of judgment the court sentenced defendant to an indeterminate term not to exceed 15 years and recommended consideration for early parole.

Defendant on this appeal raises two issues: (1) Whether the evidence was sufficient to prove beyond a reasonable doubt that defendant intentionally killed his wife; and (2) whether the indictment as read to the jury was so confusing as to deny defendant a fair trial.

The crime of first-degree manslaughter is defined by Minn. St. 609.20, which reads in part:

"Whoever does any of the following is guilty of manslaughter in the first degree and may be sentenced to imprisonment for not more than 15 years or to payment of a fine of not more than $15,000, or both:

"(1)  Intentionally causes the death of another person in the heat of passion provoked by such words or acts of another as

would provoke a person of ordinary self-control under like circumstances * * *."

As applied to this case the crucial term in the statute is "intentionally," which is defined in § 609.02, subd. 9(3), as follows:

" 'Intentionally' means that the actor either has a purpose to do the thing or cause the result specified or believes that his act, if successful, will cause the result. In addition * * * the actor must have knowledge of those facts which are necessary to make his conduct criminal and which are set forth after the word 'intentionally.' "

Thus, the question for our determination is whether the evidence is sufficient beyond a reasonable doubt to justify the jury in concluding that the defendant had a purpose to kill his wife or believed that putting his hand around her throat, if successfully done, would cause her death.

Defendant has maintained from the outset that he intended only to restrain his wife and acted with no desire or purpose to cause her any bodily harm. However, it is clear, as the jury was instructed, that intent may be determined from outward manifestations and that it may be inferred that a person intends the natural consequences of his actions. Therefore, defendant's statements as to his intentions were in no way binding on the jury if his acts demonstrated a contrary intent.

Other than defendant's testimony the evidence of intent, like the evidence as to all the other elements of the crime, is entirely circumstantial, and circumstantial evidence will support a conviction only where the facts disclosed by it—

"* * * form a complete chain which, in the light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt * * *." State v. DeZeler, 230 Minn. 39, 52, 41 N. W. (2d) 313, 322, 15 A. L. R. (2d) 1137, 1150; State v. Beilke, 267 Minn. 526, 531, 127 N. W. (2d) 516, 520.

It must "point unerringly to the accused's guilt." 26 Am. Jur., Homicide, § 456.

Applying this standard to the present case, we encounter serious difficulties in finding that the evidence supports the verdict. First, there is some doubt raised by the testimony of Dr. Coe, a highly qualified expert, that he was unable to conclude that Helen Lundstrom's death was in fact caused by manual strangulation. While it may be assumed that a person of ordinary intelligence would know that applying sufficient pressure to the throat of another to prevent breathing will cause the death of that person if continued for a sufficient period of time, it is doubtful that the same person would know that very little pressure, properly applied, could result in cardiac arrest. Second, the physical evidence and the medical testimony are, in most respects, at least as consistent with defendant's version of how his wife died as they are with the state's. Third, the question of intent in the circumstances of this case is more subtle than in most cases. Unlike pointing a gun at someone and firing it, placing one's hand on another's throat is not in itself likely to cause death or even serious injury. It is the manner in which the hand is applied—the amount of force and pressure and the length of time—that determines the likelihood that death will result. Therefore the persuasiveness of the inference of intent to cause death from the act of placing a hand on the neck of another depends on the manner in which the hand was placed.

The facts as set out at the beginning of this opinion indicate the doubts as to the cause of death raised by defendant. Other than that bearing directly on the issue of intent, there is considerable evidence to support defendant's theory as to the cause of death. The condition of Helen's body and the washroom indicates that, as defendant claimed, he had not reacted violently toward his wife. All witnesses agreed to approximately the same time sequence. Defendant testified that his wife had said something he could not understand as she fell, which would mean that she was still alive when he released her or she jerked back. The

coroner testified that he found urine under the body, which he said was excreted at the moment of death, which indicated Helen died exactly where her body was found. Similarly, defendant's testimony as to his wife's hysterical actions is supported by the coroner, who testified that rigor mortis sets in more quickly where there is exercise in some form just prior to death and that the muscles of the deceased here were already quite stiff when he examined the body at about 3:35 a. m.

The manner in which defendant placed his hand on his wife's throat can only be determined from the medical evidence. As pointed out, the only damage revealed by the autopsy was some hemorrhaging in the area of the larynx and the external bruises. No fractures of any kind were found. In addition to raising doubts as to whether death was in fact caused by manual strangulation, this lack of substantial damage bears directly on the amount of force used by the defendant. Dr. Coe testified that he had personally encountered cases where much more severe damage had not resulted in death.

The evidence in the record indicates that Helen was hysterical and struggling with defendant at the time of her death. The autopsy established that she was 5 feet 5 inches tall and weighed 110 pounds and that only one hand caused the marks on her neck. While there is no evidence as to how big a man the defendant is, we think that the above facts, coupled with the extent of the injuries to Helen's neck, raised substantial doubt as to whether intent to cause her death can be inferred from defendant's actions. We are convinced that such circumstantial evidence does not, as it must, exclude, to a moral certainty, every other rational hypothesis except that of guilt. State v. Gorman, 219 Minn. 162, 167, 17 N. W. (2d) 42, 45.

As our past decisions indicate, we are not disposed to dismiss the determination of a jury lightly. However, the circumstances of this case indicate a strong possibility that the jury was confused on the matter of intent. In view of our determination on the first issue, it is not necessary to consider as a separate

matter the question of the inclusion in the indictment of the phrase "but without design to effect her death." However, it does bear on the weight to be accorded the evidence in light of the jury's verdict.

The phrase was part of the first-degree manslaughter provisions until the 1963 Criminal Code, at which time the legislature eliminated it. While the advisory committee on the revision was of the opinion the phrase does not have much meaning, Advisory Committee Comment, 40 M. S. A. p. 230, it would seem that at least in the eyes of a layman it would negate the need for intent. It has been said that the phrase removes all intentional homicides from the manslaughter category. Moreland, The Law of Homicide, p. 232. Informing a jury that the defendant is to be convicted if the evidence establishes that he acted with a purpose of causing his wife's death or believing his actions would do so, and at the same time saying he was charged with killing his wife without design to effect her death, is very likely to raise some degree of confusion. That it apparently did so here is evidenced by the fact that the jury came back asking for additional instructions on the meaning of the term "intent" and by the length of time it took the jury to reach a verdict.

Whatever the reason for the jury's action, we find that the record in this case leaves us with grave doubts as to defendant's guilt and accordingly conclude that the interests of justice require that there be a new trial. State v. Johnson, 277 Minn. 368, 152 N. W. (2d) 529; State v. Anderson, 272 Minn. 384, 137 N. W. (2d) 781. In the retrial the confusing phrase should be eliminated from the indictment.

Reversed and new trial granted.

Otis, Justice (dissenting).

I cannot agree that as a matter of law the state has not proved beyond a reasonable doubt that defendant intentionally caused the death of his wife. There is nothing extraordinary in permitting an unwitnessed homicide to be reconstructed by circum-

stantial evidence. Indeed, this is the usual situation. As I read this record, the jury could well conclude that the appearance of a serene and respectable marriage masked a relationship of deep and progressive hostility between defendant and his wife. It is not clear what the root of her mental and emotional disturbance was. However, there is considerable evidence that it may have stemmed from a deep-seated aversion to defendant's sexual overtures. Defendant himself testified that this had been a problem between them from the beginning of their marriage. The events which culminated in Mrs. Lundstrom's death began when she refused her husband intercourse and in a fit of anger severely bit him on the hand. When she attempted to leave the house, he sharply remonstrated with her and followed her to an outbuilding where she cried out in a voice which her daughter characterized as a scream, "Why do you always have to act like this?" According to defendant, Mrs. Lundstrom thereupon "went to pieces and started hitting me." Defendant stated he put one arm around her and his hand on her neck and pushed her against the wall. A police officer testified that defendant quoted his wife as saying, "I hate you, I hate you," immediately before defendant pushed her and she fell down. Unable to detect his wife's breathing or her pulse, defendant made no effort whatever to seek help from his daughter or otherwise to secure medical aid but took the time to dress, secure his car, and drive to the police station without making any attempt to resuscitate his wife or move her back to the house for that purpose. The marks found on her neck were entirely consistent with defendant's version of having seized his wife by the throat.

From all of the evidence recited, it was, in my opinion, the prerogative of the jury to find that defendant in a fit of passion intentionally strangled his wife. While defendant's unblemished record is a factor which the jury could consider, and undoubtedly did, it should not insulate him from a conviction for a crime of passion, as the jury found. It is inconceivable to me, as it was to the jury, in the light of the medical testimony adduced, that

Mrs. Lundstrom's death could result from anything except violent pressure exerted by a husband who was temporarily obsessed by anger and frustration. As we have so often said, in the absence of a confession, intention to effect death is an element which can be proved only by apparent motive and other surrounding circumstances. In my judgment, there was ample evidence from which the jury could find that, for however brief a moment, defendant did intend to strangle his wife and succeeded in doing so. This also was the conclusion the trial judge reached.

As to the confusion occasioned by the use of the words "intentionally" and "without a design to effect her death," it need only be said that the court instructed the jury on at least five occasions during the charge, and again when asked for further instructions, that to find defendant guilty the state must prove the death was intentionally caused. The only reference to the words "without a design to effect her death" was made in connection with a reading of the indictment. In any event, defendant made no objection nor took any exception to the charge. Under these circumstances, in my opinion no prejudice occurred and defendant has acquiesced in the charge as given and in the irregularities in the indictment.

I would affirm.

PETERSON, JUSTICE (dissenting).
I join in the dissent of Mr. Justice Otis.