**STATE of Minnesota, Respondent,**

**v.**

**Jeffrey Brian Alphonse STEIN, Appellant.**

**No. A06–1848.**

Supreme Court of Minnesota.

Jan. 7, 2010.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, David C. Brown, Assistant Hennepin County Attorney, Minneapolis, MN, for respondent.

Shane C. Perry, Minneapolis, MN, for appellant.

## OPINION

MAGNUSON, Chief Justice.

In the early morning hours of June 2, 2005, a young white man entered three homes in Mound, Minnesota. In each home, the burglar choked a female victim in her bed before running away. Police arrested appellant Jeffrey Brian Alphonse Stein later that day. Appellant was charged with three counts of first-degree burglary, Minn.Stat. § 609.582, subd. 1(c) (2008). The jury found appellant guilty of one count of first-degree burglary, but failed to reach a verdict on the other two counts. The court of appeals affirmed appellant's conviction. We granted review on the single issue of "whether there was sufficient evidence to support the jury's verdict" of guilty on one count of first-degree burglary. Because we conclude that the reasonable inferences that can be drawn from the circumstances proved are consistent with the hypothesis that appellant is guilty of the charged offense and inconsistent with any rational hypothesis other than guilt, we affirm.

During the evening of June 1, 2005, several people gathered for a party at the home of brothers J.B. and M.B. In addition to J.B. and M.B., J.K. and appellant attended the party. Appellant's brother P.S. gave appellant a ride to the party because appellant did not have a car. P.S. testified that appellant was wearing jean shorts and a black T-shirt over a white undershirt.

On the way to the party, appellant and his brother stopped at a Wells Fargo Bank so appellant could use the ATM. Surveillance video obtained from Wells Fargo showed appellant wearing a black crew-neck T-shirt with a small white tag on the bottom of the shirt above his left leg and a breast pocket on the left side. The video also showed appellant wearing a tan baseball hat and jeans. No undershirt was visible in the surveillance video. Bank records confirmed that appellant made a balance inquiry on his bank account at 10:08 p.m.

J.B. testified that appellant arrived at the party around 9:30 or 10 p.m. and wore a black Dickies work shirt. A.N., who also attended the party, testified that appellant wore jeans and a dark blue or black shirt. J.K. testified that appellant wore blue jeans and a black shirt to the party. M.B. testified that appellant wore a button-up shirt and jeans. Appellant drank beer and smoked cigarettes at the party.

According to testimony from both J.B. and his girlfriend, at some point between midnight and 2 a.m., the couple went to bed for the night. They did not get up until around 9 a.m. M.B. testified that he and appellant talked in M.B.'s basement bedroom during the party. M.B. further testified that appellant stayed in M.B.'s room until M.B. fell asleep around 4 or 4:30 a.m.

According to J.K., around 3:30 a.m., J.K., A.N., S.S., and appellant left the party in J.K.'s truck. First, J.K. dropped off A.N. and S.S. at S.S.'s home. According to J.K., he dropped appellant off on a street corner about 50 feet away from S.S.'s home because J.K. did not wish to drive across town to appellant's home. J.K. testified that after dropping off appellant, he drove home and went to bed.

In the early morning hours of July 2, 2005, P.B. woke up in her bed to a strange

noise. She saw an unidentified man in her bedroom crouched down holding something in his hand. The intruder jumped on P.B.'s bed, put something over P.B.'s face, and began choking her. P.B. yelled for her son to call 911. P.B.'s son called the police, who received the call at 3:59 a.m. After P.B. forced the intruder off of her, the burglar ran down the stairs and out of the house. P.B. described the intruder as a young, lean, white male wearing a light-colored baseball hat and shorts that were dark plaid.

The police arrived at P.B.'s home within 2 minutes of receiving the 911 call. P.B. told a police officer that the intruder had run into the woods adjacent to P.B.'s house. The police called for other officers to set up a perimeter around the area of P.B.'s home. While the police were interviewing P.B., they received a call reporting a second home invasion.

J.B., who lived approximately a quarter-mile from P.B.'s house, woke up in her home to a loud noise. J.B.'s 11–year–old daughter told J.B. that a man had entered her room and choked her. After observing red marks on her daughter's neck, J.B. called the police. The police received J.B.'s call at 4:17 a.m. J.B.'s daughter testified that the intruder was a white teenage man wearing jean shorts with visible blue plaid boxer shorts underneath. J.B.'s daughter also testified that the intruder was shirtless.

After receiving the second call, the police drove to J.B.'s home. On the way, the police widened the perimeter to include the area around J.B.'s home.

Officer Andy Lamers of the New Hope Police Department K–9 unit also arrived at J.B.'s home, where Officer Lamers and his dog tried to track the intruder. Officer Lamers' dog followed a scent until the dog eventually lost the trail.

Around 5:00 a.m., D.B. woke up at home to a strange man in her bed. D.B. lived approximately three-quarters of a mile from J.B.'s home. The intruder straddled D.B. in her bed, choked her, and punched her in the face several times. D.B. fought back, attempting to strike the intruder in the head and eventually knocking the intruder off her bed by kicking him in the torso. D.B. then jumped off her bed and grabbed the intruder by the shirt. The intruder "pulled himself out of his shirt" leaving the shirt in D.B.'s hand. D.B. chased the man, who exited through a sliding glass door on the lower level of her house. She locked the door, and then ran upstairs to check the locks on the other doors. From upstairs, she saw the man return to the door he had exited and try to get back in. She yelled at him to go away. Eventually the intruder fled. D.B. saw the intruder jump over her fence and run away between two neighbors' houses.

D.B. testified that her attacker was a white male in his late teens or early twenties, wearing pants with boxer shorts sticking out of his pants. D.B. also testified that the intruder's breath smelled of cigarettes. Police later recovered a hair from D.B.'s bed. The police concluded that the hair was not appellant's. The intruder's shirt recovered at D.B.'s house was a black Dickies crew neck T-shirt with a left breast pocket and a small, white Dickies tag on the lower front left of the shirt.

The K–9 unit tracked a scent trail from a location near D.B.'s home to the shoreline of a nearby lake. An officer thought he saw someone swimming in the lake.

Around 6:10 a.m., a Mound resident living north of the lake and a few blocks from the first victim's home opened the blinds in her home and saw an unidentified man approaching her house. The resident testified that the man appeared to be in his late teens or early twenties, and was wear-

ing no shirt, wet jeans with plaid boxers visible, and a baseball hat. The resident called 911.

Around 6:30 a.m., a Minnetrista resident observed a man running outside her home. According to the resident, the man was wearing a baseball cap and loose shorts with darker underwear exposed. The resident thought the sight of the man running outside her home was unusual, but did not call the police until the resident's son informed her that police were conducting a manhunt in the area.

At approximately 7 a.m., a third resident testified that he saw a young, shirtless white man run across his yard. Appellant's home is only a few blocks away from the home of the third resident.

On June 2, 2005, appellant lived with his brothers R.S. and J.S. at their house in Mound. Appellant usually slept on the couch. R.S. testified that on the morning of June 2, 2005, he got up at 5:30 a.m. and left for work around 6:15 or 6:30 a.m. R.S. did not see appellant that morning. J.S. testified that he got up around 6 a.m. and left for work around 6:15 a.m. on June 2, 2005. J.S. also did not see appellant that morning.

Police interviewed J.B., the host of the gathering appellant attended the previous night, on the morning of June 2, 2005. J.B. matched the physical description of the burglar and agreed to speak to the police. Based on Detective Dan Niccum's conversation with J.B., police went to appellant's workplace to speak to appellant.

Detective Niccum arrived at appellant's workplace at about 11:15 a.m. on June 2, 2005. Niccum observed scratches on appellant's body. Photos taken of appellant showed scratches on his neck, torso, back, arms, and legs. Appellant told Detective Niccum that he (appellant) wore a white T-shirt on June 1, 2005, and was at home on the couch when the assaults took place. Police later searched appellant's home but found no wet clothing or other evidence linking appellant to the crimes.

The State conducted a DNA analysis of the black T-shirt recovered at victim D.B.'s house. The State's DNA expert testified that the DNA profile generated from the T-shirt showed a mixture of DNA from two or more individuals, but with the "predominate profile" in the mixture matching the known DNA sample taken from appellant. The State's expert estimated the probability of a random person's DNA profile matching the predominate profile found on the shirt at one in 58 trillion. Appellant's DNA expert interpreted the same data and concluded that the probability of a random match was one in 644,000.

The State charged appellant with three counts of first-degree burglary, Minn.Stat. § 609.582, subd. 1(c) (2008).[1] The jury found appellant guilty of one count of first-degree burglary for the incident involving D.B. (the victim who ripped the shirt off of the intruder), but failed to reach a verdict on the two counts relating to the other burglary incidents. Appellant was sentenced to 48 months in prison. The court of appeals affirmed appellant's conviction,

---

1. Minn.Stat. § 609.582, subd. 1(c), provides that:

Whoever enters a building without consent and with intent to commit a crime, or enters a building without consent and commits a crime while in the building, either directly or as an accomplice, commits burglary in the first degree and may be sentenced to imprisonment for not more than 20 years or to payment of a fine of not more than $35,000, or both, if:

. . .

(c) the burglar assaults a person within the building or on the building's appurtenant property.

concluding that that the evidence presented at trial was sufficient to support a conviction for burglary. *See State v. Stein*, No. A06–1848, 2008 WL 313603, at *5 (Minn.App. Feb.5, 2008). We granted review on the single issue of whether there was sufficient evidence to support the jury's verdict finding appellant guilty of first-degree burglary.[2]

■ When reviewing a claim for sufficiency of the evidence, we "ascertain[ ] whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged." *Bernhardt v. State*, 684 N.W.2d 465, 476 (Minn.2004). In reviewing a jury verdict, "we view the evidence in a light most favorable to the verdict and assume the jury believed the state's witnesses and disbelieved contrary evidence." *State v. Brocks*, 587 N.W.2d 37, 42 (Minn.1998).

■ A conviction based on circumstantial evidence receives stricter scrutiny than a conviction based on direct evidence. *State v. Bias*, 419 N.W.2d 480, 484 (Minn.1988). In addition to the analysis we apply in direct evidence cases, the court also considers whether the reasonable inferences that can be drawn from the circumstances proved support a rational hypothesis other than guilt. "Circumstantial evidence must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Taylor*, 650 N.W.2d 190, 206 (Minn.2002).

■ Even in cases based on circumstantial evidence, however, we have recognized that "the jury is in the best position to evaluate the evidence[,]" and we "will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture." *State v. Lahue*, 585 N.W.2d 785, 789 (Minn.1998).

> To successfully challenge a conviction based upon circumstantial evidence, a defendant must point to evidence in the record that is consistent with a rational theory other than his guilt. However, possibilities of innocence do not require reversal of a jury verdict so long as the evidence taken as a whole makes such theories seem unreasonable.

*Taylor*, 650 N.W.2d at 206 (internal quotation marks and citations omitted).

Appellant argues that on appeal in a circumstantial case, the court must examine all of the evidence introduced at trial, and in effect re-weigh that evidence as part of our review. This is not what we do. Our cases have long distinguished between a review of the "circumstances proved" based on the factual evidence, and the inferences to be drawn from those circumstances. For example, in *State v. Johnson*, we said:

> The primary rule of evidence in a criminal case is that, in order to convict the accused, the jury must be satisfied beyond a reasonable doubt of his guilt, and the test is whether or not there is evidence sufficient to justify the jury in finding him guilty beyond reasonable doubt. Various secondary rules relating to circumstantial evidence have been stated by the courts. Perhaps the most generally used rule is that all the circumstances proved must be consistent

2. We confine our review to the single burglary for which the jury found appellant guilty. Because we did not grant review on the issue of whether the district court should have granted appellant's motion for judgment of acquittal on the two remaining burglary counts, we decline to address the issue.

with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of his guilt. By the term "circumstances proved" is not meant every circumstance as to which there may be some testimony in the case, but only such circumstances as the jury finds proved by the evidence. There may well be in any case testimony on behalf of the defendant as to inconsistent facts and circumstances, not conclusively proved, and which the jury may have a right to and do reject as not proved. Followed to its logical conclusion, the secondary rule stated reverts back to the reasonable doubt rule. For, if any one or more circumstances found proved are inconsistent with guilt, or consistent with innocence, then a reasonable doubt as to guilt arises.

173 Minn. 543, 545–46, 217 N.W. 683, 684 (1928) (citation omitted).

In *State v. Scharmer*, 501 N.W.2d 620, 622 (Minn.1993), we conducted a "detailed review of the evidence," and found it insufficient to convict. The State had presented evidence that two burglaries took place, that two witnesses saw the burglar exit the store that was robbed (but could not identify the defendant at trial), that a police dog followed the defendant's scent to a location 100 yards from a grain elevator, that the officer then drove the remaining distance to that grain elevator, where the defendant was found lying down, and that a crowbar and a glove were found near the defendant in the grain elevator. *Id.* at 620–21. Because none of the physical evidence introduced at trial was ever linked to the defendant, "who fit the description given by the eyewitnesses primarily because of the color of his skin[,] [p]roof of the facts was left more to conjecture and speculation than to reasonable inferences." *Id.* at 621–22. We reversed the conviction because "[t]he evidence did not form a complete chain leading so directly to appel-

lant's guilt as to exclude beyond a reasonable doubt any rational hypothesis except that of his guilt." *Id. See also State v. Swain*, 269 N.W.2d 707, 713 (Minn.1978) (holding that evidence that defendant had threatened the victim 10 months before the murder, that the murderer had attacked from behind, and that there were repeated blows to the victim's head, was insufficient as a matter of law to show premeditation).

 *Scharmer* and similar decisions have been read by some, including appellant here, as standing for the proposition that appellate courts can and should independently examine all of the evidence in the record—as well as the inferences drawn from that evidence—in evaluating sufficiency in circumstantial evidence cases, and should not draw inferences only from the circumstances proved. But as we noted 90 years ago in *State v. Johnson*, we do not reverse convictions simply because the defendant can point to facts in the record that arguably support a rational inference other than guilt. We consider the inferences that can be drawn from the circumstances proved, which do not include "every circumstance as to which there may be some testimony in the case, but only such circumstances as the jury finds proved by the evidence." 173 Minn. 543, 545, 217 N.W. 683, 684 (1928). Indeed, we reaffirm today that "[t]here may well be in any case testimony on behalf of the defendant as to inconsistent facts and circumstances, not conclusively proved, and which the jury may have a right to and do reject as not proved." *Id.* Where the jury has rejected conflicting facts and circumstances, we do not draw competing inferences from those facts on appeal.

This does not mean, however, that we ignore our traditional rule of stricter scrutiny in circumstantial cases. Although we

start from the premise that even in circumstantial cases we give deference to the fact finder's weighing of conflicting evidence, when we review the inferences that might be drawn from the facts found, we look through a different lens.

█ In assessing the inferences drawn from the circumstances proved, the inquiry is not simply whether the inferences leading to guilt are reasonable. Although that must be true in order to convict, it must also be true that there are no other reasonable, rational inferences that are inconsistent with guilt. In circumstantial evidence cases, we give no deference to the fact finder's choice between reasonable inferences; this is so because our inquiry addresses not only the reasonableness of the inferences made by the fact finder, but also the reasonableness of other possible inferences that the fact finder may not have drawn. Because we give no deference to inferences not made (*i.e.*, alternative inferences that the fact finder chose to reject), we examine independently the reasonableness of all inferences that might be drawn from the circumstances proved, including inferences consistent with innocence. *See, e.g., State v. Gorman*, 219 Minn. 162, 167–69, 17 N.W.2d 42, 45–46 (1944) (affirming a murder conviction in a case with "no substantial dispute as to the facts and circumstances" by holding that the jury's inferential conclusion that the victim's injuries "could not have been caused by [a fall]" "but only by a blow with an instrument" was "amply sustained by the record . . . .").

Thus, our analysis begins by deferring to the jury's resolution of conflicts in the evidence regarding directly proven facts. We then focus on whether those circumstances proved complete the link between the defendant and guilt. For example, in *State v. Webb*, 440 N.W.2d 426, 431–32 (Minn.1989), another murder case, we be-

gan our analysis by listing the "circumstances" accepted by the jury that were "consistent with the hypothesis of guilt." These included "the facts that the body of the victim was found in the vicinity of the [defendant's] apartment; [the defendant] was seen speaking to [the victim] earlier in the day; and his bedspread was found near the victim." *Id.* We concluded that these circumstances proved did not support a reasonable inference of guilt, and did not "exclude other rational inferences . . . ." *Id.* at 431.

Our concurring colleagues assert that *Webb* "might have had a different result" under our analysis. According to the concurrence, our "reformulated rule . . . would have resolved ownership of the bedspread for the State as implicit in the verdict and disregarded other evidence in conflict with the verdict." But our analysis is not "reformulated." The court in *Webb* in fact did, albeit reluctantly, resolve ownership of the bedspread—as well as the defendant's speaking to the victim earlier in the day, another point where direct evidence was in conflict—in favor of the State. *Id.* at 431 n. 2 ("Although we *must accept the evidence* in a light most favorable to the conviction, we note again our grave doubts about the reliability of the evidence on these points." (emphasis added)). Webb's conviction was reversed not because the court preferred its own weighing of the direct evidence, but because the inferences drawn from the circumstances proved did not point unerringly to guilt. *Id.* at 431.

Likewise, in *Bernhardt v. State*, 684 N.W.2d 465, 467 (Minn.2004), we held that the evidence was insufficient as a matter of law to support the defendant's conviction for masterminding a murder committed by someone else. As we noted, in order to prevail in its prosecution, the State needed to prove that the defendant had ordered

the killing. *Id.* at 477. Although such an inference was, on the record, permissible, it was not compelled. *Id.* A rational hypothesis other than guilt was supported by the circumstances proved. *Id.* at 478. Notably, however, we accepted all of the circumstances which were necessary to the jury's verdict of guilt, only to find those circumstances insufficient. *Id.* at 477–78.

And where the circumstances proved are adequate, we have upheld convictions despite the existence of conflicting evidence. In *State v. Colbert,* 716 N.W.2d 647 (Minn. 2006), we considered a case similar to this case. There, the defendant argued that inconsistent witness descriptions of the car driven and the clothing worn by the shooter, the implausibility of a witness' story regarding the shooting, and the narrow timeframe between the defendant being at one location and at another, warranted his exoneration. *Id.* at 653. Defendant argued that even if the evidence was "technically sufficient," it left too many unanswered questions to support a conviction. *Id.* We rejected that argument. "Viewing the evidence as a whole in the light most favorable to the jury's verdict, we conclude that the evidence leads so directly to [defendant's] guilt as to exclude, beyond a reasonable doubt, any reasonable inference other than guilt." *Id.* at 654. In reaching that conclusion, we noted that although the defendant's version of the events, if believed, might give rise to different inferences, "the jury was free to, and evidently did, reject [defendant's] version of these events." *Id.*

In *State v. Scanlon,* 719 N.W.2d 674, 687–88 (Minn.2006), we affirmed a conviction based on circumstantial evidence, restating the analytical framework of *Webb,* 440 N.W.2d at 430–31, and *State v. Jones,* 516 N.W.2d 545, 547–49 (Minn.1994). And in *State v. Hughes,* we stated that "[c]ircumstantial evidence receives 'the same weight as any other evidence so long as the *circumstances proved* are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt.'" 749 N.W.2d 307, 312 (Minn.2008) (quoting *State v. Leake,* 699 N.W.2d 312, 319 (Minn.2005) (emphasis added)). We specifically rejected defendant's argument that *Bernhardt,* 684 N.W.2d at 465, and *State v. Swain,* 269 N.W.2d 707 (Minn.1978), required some higher quantum of proof in circumstantial evidence cases. We then examined the circumstances proved with respect to planning activity, motive, and the nature of the killing to determine whether they supported an inference of premeditation. *Hughes,* 749 N.W.2d at 313–15. As to each of these premeditation factors, we found that the reasonable inferences that could be drawn from the circumstances proved led to only one conclusion—the defendant's guilt. *See id.* at 315 ("[T]he circumstantial evidence established beyond all reasonable doubt that appellant premeditated the murder.").

Most recently, in *State v. Tscheu,* 758 N.W.2d 849 (Minn.2008), we held the evidence sufficient to support a murder conviction. In a purely circumstantial case, we rejected the defendant's argument that another person killed the victim, reasoning that the defendant's hypothesis was unreasonable in light of the circumstances proved:

> The evidence, however, proved that the DNA found under [the victim's] fingernails and the semen found on her body belonged to Tscheu. And while it is theoretically possible that someone else was involved in a struggle with [the victim], there is no physical evidence in the record to provide reasonable support for this hypothesis.

*Id.* at 860–61. Thus, we concluded that the circumstances proved did not reason-

ably support the defendant's alternative hypothesis.

■ Applying the analytical framework established by our prior cases, our first task is to identify the circumstances proved. Taken in a light most favorable to the State, the evidence in the record shows that appellant was in the area in question at the time of the burglaries; his clothing, including a black Dickies T-shirt, and general physical description matched the descriptions provided by the victims; the DNA taken from the black Dickies T-shirt matched a sample provided by appellant; the Dickies T-shirt retrieved from D.B.'s home matched the black T-shirt worn by appellant in the ATM surveillance video; the trail established by the K–9 units and the suspicious-person sightings led from the scene of the third burglary to an area near appellant's home; appellant was not seen sleeping on the couch when his brothers left for work; and detectives observed numerous scratches on appellant's chest and neck that same morning.

In laying out these factual circumstances, we defer, consistent with our standard of review, to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State. For example, we assume that the jury did not credit the testimony that appellant wore a white shirt or a button-up shirt to the party because this testimony is directly contradicted by other witnesses who testified that appellant wore a black shirt. In addition, we assume that the jury did not believe testimony that appellant was at home on the couch when the burglary occurred, because this testimony was inconsistent with the testimony of appellant's brothers, and irreconcilable with the result reached by the jury. *Cf. Colbert,* 716 N.W.2d at 653.

Because the State did not present any direct evidence that appellant committed the burglary, our analysis proceeds to a second stage: we determine whether reasonable inferences drawn from the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis other than guilt. *See State v. Hatfield,* 639 N.W.2d 372, 376–78 (Minn.2002).

Appellant hypothesizes that J.B., M.B., J.K., or someone else entirely committed the burglary. The relevant inquiry, therefore, is whether the circumstances proved support a reasonable hypothesis that J.B., M.B., J.K., or another man committed the burglary.

J.B. shares many of the physical characteristics of appellant, and was initially a suspect in the burglaries. However, the circumstances proved do not reasonably support the hypothesis that J.B. committed the burglaries. For example, both J.B. and his girlfriend testified that, at some point between midnight and 2 a.m., J.B. and his girlfriend went to bed for the night. They did not get up until around 9 a.m. In addition, the State's DNA expert concluded that J.B.'s DNA was not on the black shirt recovered by police. Thus, considering the evidence in a light most favorable to the verdict, the circumstances proved establish that J.B. was sleeping at home when the burglaries occurred. Once those facts are accepted as true, no reasonable inference can be drawn that J.B. was the burglar.

Appellant runs into the same problem with respect to his theory that M.B. or J.K. committed the burglaries. M.B. testified that he fell asleep around 4 or 4:30 a.m. In addition, J.K. testified that he drove home and went to bed after dropping appellant off on a street corner around 3:30 a.m. The circumstances proved establish that M.B. and J.K. were asleep at the time of the burglary. Again,

once these facts are accepted as true, no reasonable inference can be drawn that either M.B. or J.K. was the burglar.

The circumstances in this case also include the uncontroverted facts that: none of the witnesses identified appellant in court as the burglar; appellant had no scratches around his eyes; appellant showed no bruises on his knuckles, face, chest or torso; the hair found in D.B.'s bed did not belong to appellant; and no wet clothing was discovered at appellant's home. However, none of these facts are inconsistent with guilt, nor do they establish a coherent alternative hypothesis that would explain how appellant's DNA ended up on the intruder's shirt, a shirt that matched the shirt worn by appellant in the ATM video. As we have stated: "Inconsistencies in the state's case or possibilities of innocence do not require reversal of a jury verdict so long as the evidence taken as a whole makes such theories seem unreasonable." *State v. Ostrem*, 535 N.W.2d 916, 923 (Minn.1995). Based on our independent review of the reasonable inferences that can be drawn from the circumstances proved, we conclude that they do not support a rational hypothesis other than guilt.

In sum, none of the gaps in the State's circumstantial case identified by appellant support a reasonable inference that anyone but appellant committed the burglary. Appellant's theory that J.B., M.B., or J.K. committed the burglary directly conflicts with evidence presented by the State— evidence we assume the jury believed. Further, appellant's theory that another person committed the burglary is not reasonable in light of the inculpatory evidence presented by the State. Thus, we conclude that the evidence presented at appellant's trial was sufficient to support the jury's verdict.

Affirmed.

Concurring, ANDERSON, PAUL H., and MEYER, JJ.

Concurring, MEYER, PAGE, and ANDERSON, PAUL H., JJ.

Took no part, DIETZEN, J.

ANDERSON, PAUL H., Justice (concurring).

I concur in the affirmance of Stein's conviction but write separately to join in the concurrence of Justice Meyer.

While I joined in the majority in *State v. Tscheu*, 758 N.W.2d 849 (Minn.2008), I am now concerned that the plurality's opinion in this case will work in concert with *Tscheu* to "effectively eliminate[ ] our traditional standard of review" for circumstantial evidence. *Id.* at 869 (Meyer, J., concurring). The plurality opinion unduly narrows our traditional standard of review for circumstantial evidence by replacing the term "circumstantial evidence" with "circumstances proved" and then restricting review of "circumstances proved" to only those circumstances deemed by the court to be implicit in the guilty verdict. But "circumstances proved" is broader than this; it includes an examination of more than what we may deem to be implied in the jury's guilty verdict. A close examination of what we did in *State v. Pankratz*, 238 Minn. 517, 57 N.W.2d 635 (1953)—a case where we used the phrase "circumstances proved" but examined the circumstantial evidence as a whole—illustrates my view that the standard articulated by the plurality is a departure from our traditional method of review.

In *Pankratz*, the defendant's conviction of second-degree manslaughter was based entirely on circumstantial evidence. The deceased was last seen with the defendant, who had offered to drive the deceased to her home in Genola after an evening of

drinking in Little Falls. The deceased's body was found the next morning in her cousin's home in Pierz. *Id.* at 521–22, 57 N.W.2d at 638. The cause of death was "respiratory failure due to subdural hemorrhages and hemorrhages into the brain, the results of traumatic injury." *Id.* at 530, 57 N.W.2d at 643.

In addressing the defendant's claim in *Pankratz* that the evidence was insufficient to support the verdict, we conducted an exhaustive review of the circumstantial evidence. This evidence included: defendant's testimony that the deceased jumped from the defendant's car and was dead when he picked her up; evidence impeaching defendant's testimony "to such an extent that the jury would be justified in concluding that he was not telling the truth"; evidence that the deceased was still alive when defendant placed her in her cousin's home; evidence that the traumatic injury could have been caused in several ways, such as a fall from a car, a blow to the head, or a bump received in a scuffle; evidence as to dissimilarity in the soil at the location defendant claimed the deceased jumped and soil found on her shoes and clothing; evidence that the soil found on the deceased's shoes and clothing was similar to samples taken from an oat field; testimony of farmers who lived near the oat field as to hearing a car stop in the field, including the length of time the car remained in the field and the absence of an outcry; evidence that the deceased's comb was found at the place where defendant claimed she jumped; evidence that the deceased's watch stopped at 1:30 a.m.; and evidence that defendant desired the company of a girlfriend the whole evening. *Id.* at 532–35, 57 N.W.2d at 644–45. Noting that the credibility of defendant's testimony was for the jury to determine, we con-

cluded the evidence sufficiently established the essential elements of the crime of which defendant was convicted. *Id.* at 535, 57 N.W.2d 635. Importantly, in arriving at this conclusion, we did not limit our review to only those circumstances implicit in the jury's guilty verdict. *See also State v. Anderson,* 379 N.W.2d 70, 75–78 (Minn. 1985) (employing broader analysis under rule with phrase "circumstantial evidence" instead of "circumstances proved").

In testing sufficiency of evidence in criminal cases, the issue is whether the State has presented evidence from which a reasonable jury could be persuaded by the constitutionally high standard of proof beyond a reasonable doubt. For convictions based on circumstantial evidence, "that evidence must be consistent with the hypothesis that the accused is guilty and inconsistent with any other rational hypothesis except that of guilt." *State v. McArthur,* 730 N.W.2d 44, 49 (2007) (internal quotation marks omitted). I believe the plurality has articulated a standard that is inconsistent with this traditional, broader review and potentially eliminates any possibility of meaningful review. Therefore, I agree with Justice Meyer that we should retain, without modification, our traditional standard of review for circumstantial evidence.

MEYER, Justice (concurring).

I join in the concurrence of Justice Paul H. Anderson.

MEYER, Justice (concurring).

Although I concur with the outcome reached by the plurality,[1] I disagree with the plurality's formulation of the appellate review standard and analysis of the underlying claim. The plurality's formulation of

---

1. By plurality, I am referring to the opinion authored by Chief Justice Magnuson, joined in by Justice G. Barry Anderson and Justice Gildea.

the standard for review of convictions based on circumstantial evidence is a far-reaching departure from our traditional rule, which calls for careful review of the rationality of the jury's inferences from the evidence and their sufficiency to overcome the presumption of innocence and establish guilt beyond a reasonable doubt. Furthermore, I agree with the opinion of Justice Paul H. Anderson, who concludes that the plurality's rule denies meaningful review.

### I.

In reviewing claims of insufficient evidence, the trial court on a motion for judgment of acquittal, and the appellate court in reviewing the claim on appeal, apply the same basic standard of review.[2] "Even the trial court, which has heard the testimony of witnesses firsthand, is not to weigh the evidence or assess the credibility of witnesses when it judges the merits of a motion for acquittal." *Burks v. United States*, 437 U.S. 1, 16, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). The trial court "is to submit a case to the jury if the evidence and inferences therefrom most favorable to the prosecution would warrant the jury's finding the defendant guilty beyond a reasonable doubt." *Id.* "Obviously a federal appellate court applies no higher a standard; rather, it must sustain the verdict if there is substantial evidence, viewed in the light most favorable to the Government, to uphold the jury's decision." *Id.* at 17, 98 S.Ct. 2141. As *Tibbs v. Florida* explained, there is a difference between a conviction set aside based on the weight of the evidence and a conviction set aside based on insufficient evidence. 457 U.S. 31, 42–43, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The reviewing court's finding that

the evidence was "legally insufficient" to support conviction " 'means that the government's case was so lacking that it should not have even been *submitted* to the jury.' " *Id.* at 41, 102 S.Ct. 2211 (quoting *Burks*, 437 U.S. at 16, 98 S.Ct. 2141) (emphasis in original).

According to the plurality's analysis, however, a somewhat different standard applies on appeal: first, the appellate court identifies the facts implicit in the verdict, disregards conflicting evidence, and then determines the inferences from the facts implicit in the verdict. The plurality maintains this rule is based on an analytical framework established in our cases. But I read our cases as demonstrating that although we accept the State's evidence, we make an independent evaluation of the inferences derived from the circumstantial evidence, assessing rationality and whether they established guilt beyond a reasonable doubt. *E.g., State v. McArthur*, 730 N.W.2d 44, 50 (Minn.2007) (affirming murder conviction following independent evaluation of circumstantial evidence of premeditation); *State v. Jones*, 516 N.W.2d 545, 549 (Minn.1994) (reversing assault conviction following independent evaluation of circumstantial evidence); *State v. Loss*, 295 Minn. 271, 281, 204 N.W.2d 404, 409–10 (1973) (affirming manslaughter conviction following independent evaluation of circumstantial evidence).

Cases cited by the plurality in support of its formulation of the rule turned on credibility. *E.g., State v. Colbert*, 716 N.W.2d 647, 654 (Minn.2006) (concluding that "the jury was free to, and evidently did, reject" defendant's claim that someone else had the murder weapon); *State v. Gorman*,

---

**2.** *See* 2A Charles Alan Wright and Peter J. Henning, *Federal Practice and Procedure* § 467 (4th ed. 2009); 6 Wayne R. LaFave et al., *Criminal Procedure* § 24.6(c) (3d ed. 2007); *see also* 23 C.J.S. *Criminal Law* § 1504 (2006 & Supp. 2009) (noting jurisdictions that apply a special rule for cases based only on circumstantial evidence).

219 Minn. 162, 168–69, 17 N.W.2d 42, 45–46 (1944) (concluding that credibility of expert witnesses and weight of their testimony were for the jury); *State v. Johnson,* 173 Minn. 543, 544–45, 217 N.W. 683, 683–84 (1928) (concluding that credibility of alibi witnesses and weight of their testimony were for the jury).

Other cited cases might have had a different result under the plurality's analysis. For example, in *State v. Webb,* 440 N.W.2d 426, 427 (Minn.1989), defendant Webb was found guilty of first-degree murder. Webb, who suffered from mental illness, was seen talking to the victim at a drop-in center on Easter Sunday. *Id.* The victim's body was found the next day about a block away from Webb's apartment. *Id.* at 427–28. Nearby was a plastic bag containing a bedspread. *Id.* During an interrogation, Webb was shown a photograph of the bedspread and repeatedly asked if it belonged to him. *Id.* at 428. Webb said he did not know. *Id.* When one of the officers feigned anger, Webb admitted ownership. *Id.* However, immediately after that officer left the room, Webb told the other officer that he admitted ownership "because that is what the other officer wanted him to say." *Id.* at 428–29. The bedspread was identical to some 70–100 other bedspreads used by a hotel in Duluth. *Id.* at 429. One witness testified he saw a similar bedspread in Webb's apartment. *Id.* Other witnesses said that Webb did not have a bedspread. *Id.*

We concluded the State's case was "thin in several respects," including ownership of the bedspread, and reversed the conviction. *Id.* at 429–31. In so doing, we noted:

> No physical evidence was discovered linking the victim with the appellant or his apartment despite a painstaking investigation for such evidence. No hair, fibers, blood or body fluids were found on the victim, or on the bedspread or sheet to indicate that they had ever been in appellant's apartment. Similarly, no paint flakes were found on the bedspread which would indicate that it was used to drag the victim out of the apartment, across the painted wood porch floor.

*Id.* at 431. The plurality's reformulated rule, however, would have resolved ownership of the bedspread for the State as implicit in the verdict and disregarded the other evidence in conflict with the verdict.

## II.

Typically, in assessing the sufficiency of the evidence, we review the evidence to determine "whether the facts in the record and the legitimate inferences drawn from them would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted." *State v. Moore,* 481 N.W.2d 355, 360 (Minn.1992). But when a conviction is based on circumstantial evidence, "that evidence must be consistent with the hypothesis that the accused is guilty and inconsistent with any other rational hypothesis except that of guilt." *McArthur,* 730 N.W.2d at 49 (internal quotation marks omitted).

" 'Direct evidence' is that which proves a fact without an inference or presumption and which in itself, if true, establishes that fact." 1 Barbara E. Bergman & Nancy Hollander, *Wharton's Criminal Evidence* § 1:8 (15th ed. 1997) (internal quotation marks omitted). "Circumstantial evidence is evidence from which the factfinder can infer whether facts in dispute existed or did not exist. The factfinder is permitted to draw this inference if a reasonable relationship exists between the known facts and circumstances and the facts sought to be proved." *Id.*

As explained in my concurrence in *Tscheu,* the rational hypothesis standard for evaluating circumstantial evidence was derived from *Commonwealth v. Webster,* 59 Mass. (5 Cush.) 295 (1850), a murder prosecution based entirely on circumstantial evidence. *State v. Tscheu,* 758 N.W.2d 849, 869–70 (Minn.2008) (Meyer, J., concurring). In *Webster,* Chief Justice Shaw described the advantages and disadvantages of each mode of proof, cautioned against the use of circumstantial evidence in criminal cases and set out the following rule:

> [T]he circumstances taken together should be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion, and producing in effect a reasonable and moral certainty, that the accused, and no one else, committed the offense charged. It is not sufficient that they create a probability, though a strong one; and if, therefore, assuming all the facts to be true which the evidence tends to establish, they may yet be accounted for upon any hypothesis which does not include the guilt of the accused, the proof fails. It is essential, therefore, that the circumstances taken as a whole, and giving them their reasonable and just weight, and no more, should to a moral certainty exclude every other hypothesis.

59 Mass. (5 Cush.) at 319. Courts throughout the country, including Minnesota, adopted the *Webster* rule as a jury instruction for assessing circumstantial evidence. *State v. Staley,* 14 Minn. 105, 121–22, 14 Gil. 75, 90 (1869); Irene Merker Rosenberg & Yale L. Rosenberg, *"Perhaps What Ye Say is Based Only on Conjecture"—Circumstantial Evidence, Then and Now,* 31 Hous. L. Rev. 1371, 1392 (1995). Some 100 years later, the Supreme Court held that a reasonable doubt instruction obviated the need for a special circumstantial evidence instruction. *Hol-*land v. United States,* 348 U.S. 121, 139–40, 75 S.Ct. 127, 99 L.Ed. 150 (1954). Although we eventually abandoned the special jury instruction, *State v. Turnipseed,* 297 N.W.2d 308, 313 (Minn.1980), we retained the traditional rational hypothesis review standard. *E.g., McArthur,* 730 N.W.2d at 49.

*Holland* involved a prosecution for willful tax evasion based on a "net worth" theory, a method of proof involving "something more than the ordinary use of circumstantial evidence in the usual criminal case." 348 U.S. at 124, 75 S.Ct. 127. Although the Court permitted net worth prosecutions, it emphasized the "dangers that must be consciously kept in mind in order to assure adequate appraisal of the specific facts in individual cases." *Id.* at 127, 75 S.Ct. 127. The Court cautioned appellate courts to "review the cases, bearing constantly in mind the difficulties that arise when circumstantial evidence as to guilt is the chief weapon of a method that is itself only an approximation." *Id.* at 129, 75 S.Ct. 127. The Court then made an exhaustive examination of the government's evidence, including the government's negation of the defendants' claims inconsistent with guilt, detailed investigations of leads that if true would have established innocence and evidence of a consistent pattern of underreporting to establish willfulness. *Id.* at 133–37, 75 S.Ct. 127. Notably, the Court did not determine, at the outset, facts implicit in the verdict, disregard conflicting evidence and then determine the inferences from the facts implicit in the verdict. Although the Court rejected a special circumstantial evidence instruction, it basically employed a rational hypothesis analysis. *See id.* at 135, 75 S.Ct. 127 ("When the Government rests its case solely on the approximations and circumstantial inferences of a net worth computation, the cogency of its

proof depends on its effective negation of reasonable explanations by the taxpayer inconsistent with guilt.").

### III.

"Circumstantial evidence must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Taylor,* 650 N.W.2d 190, 206 (Minn.2002). Even with this strict standard, we have recognized that the jury is in the best position to determine credibility and weigh the evidence. *Moore,* 481 N.W.2d at 360. In applying these rules, I would analyze this case as follows.

The evidence was that on June 2, 2005, at 4:01 a.m., Mound police responded to a burglary at a home north of Lynwood Boulevard and established a perimeter around the area. At 4:17 a.m., police were dispatched to a second burglary in the vicinity of the first burglary. The police adjusted the perimeter, extending it west to Westedge Boulevard and east to Langdon Lane, and called for the emergency response unit, a small SWAT team. Around 4:30 a.m., the New Hope K–9 patrol started tracking from the site of the second burglary south through wooded areas down to the railroad bed and west along the north shore of Langdon Lake. The dog at some point went off track, but continued leading the officers south on Westedge where he seemed to be picking up the trail again.

At 5:15 a.m., a third burglary call came in from a home less than two blocks from the K–9 patrol on Westedge. The victim had ripped the shirt off the intruder and chased after him as he was fleeing her home. She could see his bare back, shorts and boxers visible above the shorts. She secured the doors to her home, looked outside to see if he was gone, and saw him coming back. As he was trying to reenter her home, the victim was screaming at him, telling him the police would be there soon. The intruder left, running east toward the neighbor's house.

The New Hope K–9 patrol was near the area of the third burglary when that call came in, but because the officers had no idea where the home was located, they let the dog lead. They "trailed" east on Beachwood Road to where they picked up a trail in a yard covered with cottonwood seeds. It was obvious by sight that someone had run through the yard. The dog tracked north through the yard and down to the shoreline. The dog wanted to go out into the water, and the handler's partner thought he saw a splash and someone swimming in the lake. By this time Trooper 7, a helicopter patrol, had arrived and was asked to do a perimeter of the lake, but nothing "positive" came of that search. The New Hope K–9 patrol stopped tracking because the dog was tired.

At 6:10 a.m., a Mound resident saw a shirtless young man in the area of the first burglary, north of the lake. He was wearing jeans "hanging kind of low," with plaid boxers visible above the shorts, and a baseball cap on backwards. He was wet "only" or "maybe" up to his thighs. He walked north to a neighbor's house and then turned around, heading back toward the trees. The resident noted there was a helicopter patrol "flying around and he wasn't leaving."

At around 6:30 a.m., a shirtless young man was seen running between houses on Sunnybrook Circle, about three-quarters of a mile north of the first suspicious-person sighting. He was wearing loose pants with darker underwear visible, and a baseball cap on backwards. He crossed over a small bridge and continued north in

the direction of the Westonka public schools. Sometime after 7:20 a.m., the Minnetonka K–9 patrol tracked from the small bridge to the elementary school and continued north toward the high school. The officers stopped tracking for safety reasons, given the time of day and number of students around.

Meanwhile, at about 7:00 a.m., a Minnetrista resident saw a shirtless young man running across the yard, east-to-west toward Sunnyfield Road. A bank of trees blocked the resident's view to the north, but because the young man did not turn south, the resident presumed he turned north.

After the tracking concluded, the police conducted a grid search, during which they encountered J.B. J.B. and his brother M.B. lived on Lynwood, in the area of the first two burglaries. J.B. had heard helicopters "buzzing" over his house, turned on the news, and walked outside. He told the police he had some friends over the night before and provided their names, including appellant's. Because the K–9 trackings and suspicious-person sightings were heading in the direction of appellant's home, his name was "significant." The police located appellant at his workplace. He had scratches on his arms and neck and was taken into custody. Photos taken at the police department that day showed appellant also had scratches on his chest, back, and legs.

There was evidence that appellant was living with his brothers in a house on Sunnyfield Road. He slept on the living room couch. On June 1, appellant got a ride to a gathering at J.B. and M.B.'s home. En route, at 10:08 p.m., appellant completed an ATM transaction. Around 3:30 a.m., appellant left the gathering in J.K.'s truck. J.K. dropped appellant off near Lynwood and Langdon Lane, drove south to his home, and went to bed.

Other evidence included testimony that appellant was not sleeping on the couch when his brothers left for work, around 6:15–6:30 a.m. on June 2; that his cell phone records showed consistent usage throughout the evening of June 1 and morning of June 2, except for a break between a call placed at 3:17 a.m. and 6:20 a.m., when no calls were placed; and that the 6:20 a.m. call was to appellant's own cell phone. There was an ATM surveillance video showing appellant wearing a baseball cap, blue jeans, and a black T-shirt with a white tag at the bottom and a pocket; testimony that the T-shirt seen in the video matched the Dickies T-shirt recovered from the third victim; and testimony that the DNA profile generated from the T-shirt was consistent with a mixture and that the predominant contributor matched the profile from the biological sample provided by appellant.

The reasonable inferences that I believe may be drawn from this evidence are that the intruder was on foot; that he fled shirtless from the third home; that he ran to the southeast corner of the lake; that he traveled north around the lake and through the perimeter set up by the police; that he continued on a course toward Sunnyfield Road and then turned north. Appellant was on foot in the area at the time of the first two burglaries; he was wearing a black Dickies T-shirt that matched the shirt obtained in the third burglary; and his DNA was on that shirt. In addition, appellant lived a few houses north of the last suspicious-person sighting, and he had scratches on his arms, chest, back, and legs, consistent with moving shirtless through brush and wooded areas in an effort to elude the manhunt.

Appellant contends that where the "burglar escaped by swimming in Langdon Lake," his cell phone would have been "ruined"; yet appellant's cell phone was

still working even when he was in jail, where he made cell phone calls until the police "took it away from him." Although the New Hope K–9 partner thought he saw someone swimming in the lake, the helicopter patrol's contemporaneous surveillance of the lake indicated otherwise; and the testimony was that the suspicious person moving through the police perimeter was wet "only" or "maybe" up to his thighs.

As to appellant's alternative perpetrator evidence—that J.K., J.B., or M.B. committed the burglaries—I would conclude that has more to do with the credibility of witnesses than the circumstantial evidence rule. J.K. testified that he drove home and went to bed. J.B. was excluded by DNA evidence and testified that he was also home in bed. M.B., unaware that he had been called by the defense to implicate himself as a suspect, testified that he did not commit the burglaries. The credibility of these witnesses and the weight of their testimony were for the jury.

Nevertheless, giving deference to the jury's evaluation of witness credibility and the weight of their testimony does not, in my view, absolve us from taking seriously our obligation to scrutinize the inculpatory circumstantial evidence. The ultimate determination of guilt is based also on inferences from the evidence, but the jury is given no guidance by way of instruction in the analysis of this evidence. As I said in *Tscheu*, our rational hypothesis appellate review standard allows us " 'to oversee whether the jury's inferences from circumstantial evidence were in fact rational and sufficient to establish proof beyond a reasonable doubt.' " 758 N.W.2d at 871 (Minn.

2008) (Meyer, J., concurring) (quoting Rosenberg & Rosenberg, *supra*, at 1415). I would conclude that the inferences drawn from the evidence in appellant's case were rational and formed a complete chain, in view of the evidence as a whole, leading so directly to the guilt of appellant as to exclude beyond a reasonable doubt any reasonable inference other than guilt.

## IV.

The circumstantial evidence rule "is founded upon the presumption of innocence and its demand that guilt be proved beyond a reasonable doubt." *State v. Kaster*, 211 Minn. 119, 121, 300 N.W. 897, 899 (1941). The reasonable-doubt standard "is a prime instrument for reducing the risk of convictions resting on factual error." *In re Winship*, 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). But neither the reasonable doubt jury instruction nor the basic appellate review standard "comes to grips with the separate issue addressed by use of the reasonable hypothesis of innocence test at the trial and appellate levels, namely, the proper evaluation of circumstantial evidence." Rosenberg & Rosenberg, *supra*, at 1420. Our traditional rational hypothesis review standard provides added assurance against wrongful convictions.[3] I join in the opinion of Justice Paul H. Anderson because I agree the plurality's standard denies meaningful appellate review.

PAGE, Justice (concurring).

I join in the concurrence of Justice Meyer.

---

**3.** In the event the plurality's view proves correct, meaning that we have abandoned our traditional appellate review standard, then I would reassert my plea that "we should revisit *Turnipseed* to consider cautionary instruc-

tions so that the jury will be advised that circumstantial evidence must exclude every rational hypothesis except that of guilt." *Tscheu*, 758 N.W.2d at 871 (Meyer, J., concurring).

ANDERSON, PAUL H., Justice (concurring).

I join in the concurrence of Justice Meyer.