*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0716**

State of Minnesota,
Respondent,

vs.

Sammy Lee Mays,
Appellant.

**Filed April 13, 2015
Affirmed
Hooten, Judge**

Hennepin County District Court
File No. 27-CR-13-7978

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Kelly O'Neill Moller, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, David W. Merchant, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Schellhas, Presiding Judge; Stauber, Judge; and Hooten, Judge.

## UNPUBLISHED OPINION

**HOOTEN**, Judge

Appealing from his conviction of solicitation of a child to engage in sexual conduct, appellant argues that the state did not prove beyond a reasonable doubt that he

intended to engage in sexual conduct with the victim, and therefore the evidence was insufficient for a reasonable jury to convict him. We affirm.

## FACTS

In the fall of 2012, appellant Sammy Lee Mays was a 45-year-old school bus driver. He was assigned a route that included an afternoon pick-up at a Minneapolis middle school. S.S., a 13-year-old eighth grader at the middle school, was one of the students who rode Mays' bus. S.S. was usually one of the first students to board the bus after school, and she typically sat in the back of the bus. S.S. testified that she sometimes felt "uncomfortable" because Mays would stare at her by using his driver's mirror. S.S.'s friend and fellow eighth grader, S.M., also rode Mays' bus to the same bus stop as S.S. She sat next to S.S. on the bus. S.M. testified that, when the bus was stopped, Mays "typically" looked at S.S. in the back of the bus through the rearview mirror.

Mays and S.S. would occasionally talk while on the bus. On one occasion, Mays noticed S.S. was listening to music and asked her what she was listening to. On another occasion, S.S. asked Mays questions about being a bus driver because her aunt was also a bus driver. She asked him whether he liked his job and whether it paid well. Mays told her that he liked his job and that the pay was pretty good. The next day, Mays started giving S.S. money, even though S.S. never asked for or suggested that she needed money. Mays would give S.S. ten dollars nearly every Friday, either when she boarded the bus or when she got off at her bus stop. S.S. described this as a brief hand-to-hand exchange. Sometimes, Mays gave S.S. notes with the money, including the first time he gave her money. That first note said something like, "Enjoy the money and don't tell anyone else

2

or I won't be able to give you money anymore." Occasionally, Mays also gave S.S. candy bars. S.S. always showed S.M. what Mays gave her. S.S. recalled that Mays gave her ten dollars a week regularly for two to six months. S.S. initially thought that he was also giving money to other students, but later found out that she was the only student getting money from him. At some point, S.S. told Mays to stop giving her money.

On February 11, 2013, after S.S. had told Mays to stop giving her money, Mays gave her a handwritten note when she got on the bus. He told S.S. not to read the note until she got home. The note stated the following:

> I know u said I don't have to give u money.
> But I don't mind giving you money so u can buy stuff.
> I'm looking 4 a friend with benifits that's a
> virgin, that I can kick it with and have alot of fun
> with. A lot of man don't know how to have sex, they
> just go wild & fast and they girl friend don't get all
> her feeling from sex. that's why a lot of women
> be saying their boy friend don't know how to have
> sex and that they don't go long, and call them a minute
> man. it take about 5 minute to satisfy a woman.
> I've learned that long time ago. When I have sex
> I take my time so we both can enjoy sex. Sex is
> the best when u know what to do, And when u do
> it with a virgin. Because I don't have to worry
> about catching a disease or Aids. You have to be
> careful when u have sex with someone.
> When u find that right person that know what
> he's doing it's the best felling in the world.
> When I find my friend with benifits, we'll
> have alot of fun like go to the Mall of America and
> buy stuff, go on some rides, go to the movies,
> go fishing on my boat, go to the Minnesota Zoo.
> Just what ever she likes to do, like once in
> a while buy her an outfit and a new pair of shoes.
> <u>But until I find a friend with benifits I can</u>
> <u>give u money.</u> I don't mind.
> I hope I find a

> friend with benifits
> that looks like u.
> You're One beautiful black Queen!
> throw this away.

(Underlining in original.) Mays also drew a picture of a female wearing a crown. S.S. testified that she did not read the note at home, but read it on the bus. She felt "disgusted" when she read the note because she "knew that [Mays] was married and he's in his [40s] and that's not right." But, S.S. testified that Mays never tried to touch her, other than to hand her money and notes. She testified that Mays never gave his phone number to her, told her where he lived, or asked for her phone number or address. There was no evidence that Mays ever tried to set up a rendezvous with S.S.

The day after receiving the note from Mays, S.S. showed the note to school officials and reported that Mays had been giving her money. The school officials notified both the bus company that employed Mays and the police. The bus company immediately removed Mays from his route. In a meeting with his employer a week or two later, Mays admitted giving money to students on his bus and stated that he did so to help them out. Mays also admitted giving S.S. the February 11 note, but wanted his employer to understand the context surrounding why he gave her the note. When the employer asked Mays what the note "meant," Mays responded that "it was more of a spiritual thing going on." Mays admitted to the employer that "it probably wasn't a good idea to give it to her." The employer's impression was that Mays thought there was a misunderstanding regarding his giving S.S. the note, and Mays seemed remorseful. The bus company subsequently terminated Mays' employment.

4

Mays was charged with one count of solicitation of a child to engage in sexual conduct. A jury trial was held in November 2013. Mays waived his right to testify and did not call any witnesses. The jury found him guilty of the charged offense, and he was sentenced. This appeal followed.

## DECISION

Mays' sole argument on appeal is that he "did not have the specific intent to engage in sexual conduct with S.S. when he gave her the note" on February 11, 2013. "In reviewing a sufficiency of the evidence challenge, we review the record in the light most favorable to the conviction to determine whether the evidence reasonably could have permitted the jury to convict." *State v. Henderson*, 620 N.W.2d 688, 704–05 (Minn. 2001).

"A person 18 years of age or older who solicits a child . . . to engage in sexual conduct with intent to engage in sexual conduct is guilty of a felony . . . ." Minn. Stat. § 609.352, subd. 2 (2012). Under the statute, "solicit" includes "attempting to persuade a specific person . . . by letter." *Id.*, subd. 1(c) (2012). "Sexual conduct" is defined as "sexual contact of the individual's primary genital area," sexual penetration, or sexual performance. *Id.*, subd. 1(b). "Child" is defined as "a person 15 years of age or younger." *Id.*, subd. 1(a).

Solicitation of a child to engage in sexual conduct is a specific-intent crime. *See State v. Fleck*, 810 N.W.2d 303, 308 (Minn. 2012) ("The phrase 'with intent to' is commonly used by the [l]egislature to express a specific-intent requirement."). Mays' intent is thus an element of the crime. "Unlike a general-intent crime, a specific-intent

5

crime requires an intent to cause a particular result." *Id.* (quotation omitted). "'With intent to' . . . means that the actor either has a purpose to do the thing or cause the result specified[, or the actor] believes that the act, if successful, will cause that result." Minn. Stat. § 609.02, subd. 9(4) (2012). A valid conviction under section 609.352 therefore requires proof beyond a reasonable doubt either that Mays had the purpose to engage in sexual conduct with S.S., or that Mays believed his act, if successful, would cause S.S. to engage in sexual conduct with him. *See State v. Peterson*, 673 N.W.2d 482, 486 (Minn. 2004) ("[T]he Due Process Clause requires the state to prove every element of a charged offense beyond a reasonable doubt.").

As a state of mind, intent "generally is proved circumstantially, by inference from words and acts of the actor both before and after the incident." *State v. Johnson*, 616 N.W.2d 720, 726 (Minn. 2000). "A conviction based on circumstantial evidence . . . warrants heightened scrutiny" compared to a conviction based on direct evidence. *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010). This heightened scrutiny comes in the form of a two-step analysis when reviewing sufficiency-of-the-evidence challenges based on circumstantial evidence. *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013).

"The first step is to identify the circumstances proved." *Id.* "[I]n determining the circumstances proved, we consider only those circumstances that are consistent with the verdict." *Id.* at 599. "As with direct evidence, we construe conflicting evidence in the light most favorable to the verdict and assume that the jury believed the [s]tate's witnesses and disbelieved the defense witnesses." *Id.* (quotation omitted).

6

The relevant circumstances proved in this case are as follows: Mays was a 45-year-old man who drove 13-year-old S.S. on a school bus. He "typically" looked at S.S. through his rearview mirror when the bus was stopped. He gave S.S. money nearly every week over a period of months. He did not give money to other students.[1] Mays sometimes gave S.S. candy and notes. The first note Mays gave to S.S. instructed her not to tell anyone that he was giving her money. S.S. never asked for or suggested that she needed money. At some point S.S. told Mays to stop giving her money. Mays never tried to touch S.S. He never gave S.S. his phone number or told her where he lived, and he never asked for her phone number or address. On February 11, 2013, Mays gave S.S. a handwritten note that both parties describe as "sexually explicit." He told S.S. not to open the note until she got home. In the note, Mays stated that he did not mind giving S.S. money to buy things. He stated that he was looking for a "friend with ben[e]fits that's a virgin, that I can kick it with and have [a lot] of fun with." He provided details about his sexual prowess and how he makes sex enjoyable for his partner. He stated that sex was best with a virgin. He stated that, when he found his "friend with ben[e]fits," he and his friend would go to the Mall of America to buy things and go on rides, and would go to the movies, to the zoo, and fishing. He would also buy this "friend" clothes and shoes. He stated, "But until I find a friend with ben[e]fits I can give u money. I don't mind." He also stated, "I hope I find a friend with ben[e]fits that looks like u." He stated that S.S. was a "beautiful black [q]ueen" and drew a picture of a female wearing a crown.

---

[1] Mays told his employer that he gave money to more than one student on his bus. But, this statement was contradicted by S.S.'s testimony and therefore cannot be a circumstance proved. *See Silvernail*, 831 N.W.2d at 599.

At the end of the note, Mays instructed S.S. to throw the note away. S.S. showed the note to school officials the next day and spoke to police. Mays was immediately removed from his bus route. Mays later discussed the incident with his employer. He admitted giving S.S. the February 11 note and giving money out on the bus. The employer described Mays as "remorseful." Mays was subsequently terminated from his employment.

"The second step is to determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Id.* (quotations omitted). "Circumstantial evidence must form a complete chain that, as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Hanson*, 800 N.W.2d 618, 622 (Minn. 2011). The state need not remove all doubt, but it has the burden of removing all reasonable doubt. *Id.* We give no deference to the jury's choice between reasonable inferences. *Al-Naseer*, 788 N.W.2d at 474.

Mays concedes that the circumstances proved "arguably are consistent with the hypothesis that[,] by giving S.S. the note[,] Mays intended on having sexual conduct with S.S." Based on the content and circumstances of the February 11 note, along with Mays' conduct in the months leading up to it, we conclude that it was reasonable for the jury to infer that he gave S.S. the note with the intent to engage in sexual conduct with her, as required by the statute. *See* Minn. Stat. § 609.352, subd. 2. As the state persuasively argues, this inference of intent

is supported by the contents of the note itself, which undoubtedly implies that [S.S.] should become his "friend with benefits." He expressed his desire to have sex with a virgin who looked like her (a 13-year-old girl). He tried to appeal to her by bragging about his sexual prowess. He talked about the money he would spend on his "friend," listing a number of activities that would appeal to a 13-year-old girl. [His] intent is further supported by his actions in the months leading up to the note. He singled her out on the bus, gave her money every week for months, instructed her not to tell anyone about the money, and stared at her on the bus. His command to her to read the note at home and then to destroy it is evidence that he intended the note to be seen only by her, his intended target.

But, the heightened review of circumstantial evidence entails more than "simply" examining "whether the inferences that point to guilt are reasonable." *Silvernail*, 831 N.W.2d at 599. The circumstances proved must also be "inconsistent with any rational hypothesis except that of guilt." *Id.* (quotation omitted). Mays proposes an alternative hypothesis consistent with his innocence, claiming that the only reason he gave the note to S.S. was to let her know that he did not mind giving her money and that he could continue to give her money until he found a "friend with ben[e]fits." In support of this alternative hypothesis, Mays emphasizes that there is no evidence that he ever touched S.S., that they exchanged personal information such as telephone numbers and addresses, or that they met anywhere other than on the school bus.

This alternative hypothesis is not rational in light of the additional sexually explicit content in the note, which was unnecessary to Mays' purported singular goal of explaining to S.S. that he could keep giving her gifts without requiring anything in return. Rather, the note described his sexual desire for a virgin that looked like S.S., as well as

9

his own sexual prowess. And, it contained an offer that was not lost on even a child as young as S.S.—that should this virgin, who looked like S.S., become his friend, she would receive even more lucrative gifts and recreational opportunities. Along with this offer of potential gifts and recreational opportunities to the virgin that would become Mays' sexual "friend," the note also provided an implicit negative consequence if S.S. did not become his friend or if he found another sexual friend—S.S.'s gifts would stop.

In support of his alternative hypothesis, Mays also relies on evidence that is not part of the circumstances proved: namely, his explanation of the note as "more of a spiritual thing," which he claims was misunderstood by S.S. But the jury, by returning a verdict of guilty, clearly rejected these explanations for his conduct. Therefore, this additional evidence cannot be included in the circumstances proved. *See id.* ("[I]n determining the circumstances proved, we consider only those circumstances that are consistent with the verdict."). Even if this additional evidence were part of the circumstances proved, Mays' alternative hypothesis would still not be rational because this evidence is too vague and speculative to give rise to a reasonable doubt about his intent. *See State v. Stein*, 776 N.W.2d 709, 714 (Minn. 2010) ("[W]e will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture.") (quotation omitted).

Mays' other arguments are also without merit. He argues that the jury could have inferred that the only reason he asked S.S. to throw away the February 11 note was because it was sexually explicit, not because he intended to have sex with her. In light of all the circumstances proved, this would be an unreasonable inference. Mays also argues,

in support of his alternative hypothesis, that he "did not try to arrange a rendezvous with S.S." after he gave her the note. This argument is undercut, however, by the fact that he did not have the opportunity to interact with S.S. again because he was suspended as a bus driver the day after he gave her the note and was subsequently terminated.

We conclude that Mays' alternate hypothesis of his intent in giving S.S. the note is not rational in light of the sexually explicit content in the note, including the offer of more lucrative gifts and benefits for a virgin that looked like S.S., and the implicit threat of discontinued gifts to S.S. if she did not become his sexual friend. When viewed as a whole, the circumstantial evidence of Mays' intent "form[s] a complete chain that, as a whole, leads so directly to [his] guilt . . . as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *Hanson*, 800 N.W.2d at 622. The evidence is therefore sufficient to affirm his conviction.

**Affirmed.**